STATE v. SPORTSMEN'S COUNTRY CLUB AND OTHERS.[1]

January 2, 1943.

No. 33,283.

[1]Reported in 7 N. W. (2d) 495.

152

*George L. Barnard,* for appellants.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, and *H. W. Swenson,* County Attorney, for the State.

HILTON, JUSTICE.

Action for the abatement of defendant Sportsmen's Country Club as a public nuisance and to enjoin and restrain the other defendants from conducting and operating the club. The club was organized as a nonprofit corporation for social and recreational purposes. It leased premises from one of the defendants, who received as rental the membership fees of the club. It was not open to the public but only to members and their friends. Membership was allegedly obtained by making application, which was approved by the officers, and by the payment of a fee of one dollar. However, one Brosvik, a stranger and an investigator, made such application to the manager, paid the fee, was immediately admitted as a member, and forthwith was able to purchase intoxicating liquor. Membership consisted of about 800 business people from the neighboring towns. The trial court found that the club had been operated in a quiet and orderly manner. Gambling devices had been maintained in the club and gambling was permitted. It was a policy of the club to sell beer and liquor to members when the members did not have their own, though the club did not have a state license to sell beer or liquor. The sheriff raided the club on four different occasions during 1939-1940 and on each raid found large quantities of beer and liquor. Subsequently convictions were had against the club and its managers or employes,

all of the offenses having been committed upon the premises occupied by the club. On December 11, 1940, the club pleaded guilty to two charges of maintaining gambling devices in the club building. On September 23, 1940, the club was convicted of having intoxicating liquor in possession for sale without a license. On November 8, 1939, Anthony, the then manager, pleaded guilty to illegal sale of liquor at the club premises. On March 25, 1939, Robert Burnip, an employe, pleaded guilty to two charges of the sale of liquor on the club premises. On December 11, 1940, Robert Burnip further pleaded guilty to an illegal sale of liquor at the same place. In all, there were two gambling charges and five liquor charges made against the club and its employes. The trial court permanently enjoined defendants from illegally selling or serving beer or liquor and from maintaining gambling devices in the club, abated the club as a public nuisance, and permanently restrained defendants from conducting and operating the club. This appeal is from a denial of a motion for amended findings or a new trial.

In the first place, we agree with the trial court that any attempt to call this place a private club is "a mere subterfuge," and for the purposes of this decision we hold it to be a public tavern.

The fundamental question to be decided here is whether the powers of an equity court will lie to enjoin the illegal sale of intoxicating liquor and the maintenance of gambling devices. The test of what constitutes a "public nuisance" gives us little assistance, since the term itself covers almost all wrongful acts. The statement that equity will enjoin public nuisances has meaning only when limited by the well-defined class of cases to which it applies.

Very early in their history equity courts used their power to preserve peace and prevent crime. But this general criminal jurisdiction slowly waned as government became stronger. Nevertheless, equity did continue to interfere with criminal acts in certain classes of cases. 16 Harv. L. Rev. 389. These included cases involving concerted action to injure property, the prevention of

violations of public decency, and protection of the public from combinations in restraint of trade.

Cases involving the prevention of the violation of public decency rested on the general rule that equity had the power to abate public nuisances, but this rule was limited to those nuisances which affected public or private property rights. 9 Harv. L. Rev. 526. In later cases jurisdiction of the equity courts has been extended to include public nuisances caused by indecent and disorderly conduct. People ex rel. Dyer v. Clark, 268 Ill. 156, 108 N. E. 994, Ann. Cas. 1916D, 785; Oklahoma ex rel. City of Oklahoma v. Robertson, 19 Okl. 149, 157, 92 P. 144. Also, many state legislatures, through their common-law powers to define public nuisances, have enacted statutes conferring upon courts of equity the power to abate public nuisance although the acts complained of also constituted a crime and no property rights were invaded. Examples of these statutes are those enjoining and abating liquor law violations. See cases construing such statutes in 75 A. L. R. 1298. Where no statute is involved there seems to be a split among the authorities as to whether equity will expand its traditional sphere to include these new classes of cases. Many courts hold to the old rule. State ex rel. Attorney General v. Schweickardt, 109 Mo. 496, 19 S. W. 47 (injunction against sale of intoxicating liquor refused); People ex rel. L'Abbe v. District Court, 26 Colo. 386, 58 P. 604, 46 L. R. A. 850 (injunction against gambling refused); State v. Patterson, 14 Tex. Civ. App. 465, 37 S. W. 478 (same); State ex rel. Circuit Attorney v. Uhrig, 14 Mo. App. 413 (same). Cases granting equitable relief in circumstances analogous to the case before us are the following: Town of Linden v. Fischer, 154 Minn. 354, 191 N. W. 901 (public dance hall enjoined); State ex rel. Smith v. McMahon, 128 Kan. 772, 280 P. 906, 66 A. L. R. 1072 (injunction granted against systematic exaction of usury); Stead v. Fortner, 171 Ill. App. 161; Id. 255 Ill. 468, 99 N. E. 680 (illegal sale of liquor enjoined); Lofton v. Collins, 117 Ga. 434, 43 S. E. 708, 61 L. R. A. 150 (same); State ex rel. Hopkins v. Howat, 109 Kan. 376, 198 P. 686, 25 A. L. R. 1210 (injunction

granted against coal miners' strike); Commonwealth v. McGovern, 116 Ky. 212, 236, 75 S. W. 261, 66 L. R. A. 280 (prize fight enjoined); State ex rel. Crow v. Canty, 207 Mo. 439, 105 S. W. 1078, 15 L.R.A.(N.S.) 747, 123 A. S. R. 393 (bullfight enjoined); State ex rel. Zipse v. Klein (Iowa) 174 N. W. 481 (illegal sale of liquor enjoined); Allshouse v. Carragher, 171 Iowa 307, 151 N. W. 443 (same). The general rule behind these latter cases is stated in 5 Pomeroy, Eq. Jur. (2 ed.) p. 4296, § 1893:

"As a public nuisance concerns the public generally, it is the duty of the government to take measures to abate or enjoin it. Hence it follows that the government can obtain an injunction to restrain a public nuisance, without showing any property right in itself. The duty of protecting the property rights of all of its citizens is sufficient to warrant issuing the injunction. Therefore, wherever a public nuisance is shown, equity must enjoin it at the suit of the government. 'Every place where a public statute is openly, publicly, repeatedly, continuously, persistently and intentionally violated, is a public nuisance.' This definition does not include all public nuisances by any means; but it includes a class particularly covered by the principle under discussion. Injunctions obtained by the state to restrain the criminal sale of intoxicating liquors are among the most numerous of this class."

The illegal acts of the defendants here are made crimes under the laws of this state, Minn. St. 1941, § 340.05 (Mason St. 1940 Supp. § 3200-9), making it a misdemeanor to sell liquor without a license; Id. § 340.14 (§ 3200-28), forbidding gambling devices on the premises where intoxicating liquor is sold. Although equity will not enjoin the commission of a crime as such, nevertheless, if the facts disclose the need for equitable interference, equity will impose its authority notwithstanding the conduct amounts to a crime. 39 Am. Jur., p. 410, § 147. "The criminality of the act will neither give nor oust jurisdiction in chancery." State v. Vaughan, 81 Ark. 117, 126, 98 S. W. 685, 690, 7 L.R.A.(N.S.) 899, 118 A. S. R. 29, 11 Ann. Cas. 277.

There can be no question that courts with equity jurisdiction have authority to issue the writ of injunction against private persons commanding them to abate existing public nuisances and preventing the renewal of them. The important question in this case is whether a tavern set up and maintained in violation of the liquor and gambling statutes but in all other respects an orderly house in the sense of the law, falls within the general proposition or outside it. It will not fall inside the general rule unless it appears from all the facts and circumstances of the case that other remedies provided by the law were not adequate, prompt, and efficient to shut up the place in question and to keep it closed so long as the above named statutes remain in force.

The legal remedy of indictment under the criminal statutes has clearly proven ineffective, as witness the list of convictions against the club, its managers, and employes. The fact that the law is not enforced is no ground for equity to restrain the commission of a crime, 2 Story, Eq. Jur. (14 ed.) § 1217; but here no such laxity exists. See State ex rel. Vance v. Crawford, 28 Kan. 726, 737, 42 Am. R. 182, where a liquor statute providing for criminal punishment only was not considered an adequate remedy at law. It is doubtful whether a criminal action for violation of the public nuisance statute, Minn. St. 1941, § 616.01 (Mason St. 1927, § 10241), could be sustained here because of the lack of any evidence of disorderly conduct. At common law gaming houses and brothels were common nuisances, not because of the noise and disorder but on account of the evil tendency of the business. State v. Vaughan, 81 Ark. 117, 119, 120, 98 S. W. 685, 687, 688, 7 L.R.A.(N.S.) 899, 118 A. S. R. 29, 11 Ann. Cas. 277. It was otherwise as to the sale of intoxicating liquor. Though illegal, disorderly conduct had to be shown to sustain an indictment for a common nuisance. Sopher v. State, 169 Ind. 177, 81 N. E. 913, 14 L.R.A.(N.S.) 172, 14 Ann. Cas. 27. Therefore, the legal remedy of abatement after judgment under the common law would be unavailable, because a criminal nuisance could not be proved under the above statute. See Ehrlick v. Commonwealth, 125 Ky. 742,

102 S. W. 289, 31 Ky. Law Rep. 401, 10 L.R.A.(N.S.) 995, 128 A. S. R. 269, where this remedy was used. Finally the statute providing the statutory remedy for enjoining and abating a liquor nuisance, Mason St. 1927, § 3209, has been repealed by L. 1933, c. 130.

The granting of an injunction here will not only dispose of an existing nuisance but will prevent it in the future without the need of repeated prosecutions. In Mugler v. Kansas, 123 U. S. 623, 8 S. Ct. 273, 303, 31 L. ed. 205, the court said:

"They [courts of equity] can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community. Though not frequently exercised, the power undoubtedly exists in courts of equity thus to protect the public against injury."

We therefore conclude that the remedy at law is not "plain and adequate, or in other words, as practical and as efficient to the ends of justice and its prompt administration, as the remedy in equity." Boyce's Executors v. Grundy, 28 U. S. (Pet.) 210, 215, 7 L. ed. 655.

Consequently, from the above authorities and reasoning, we hold that where there have been continuous and persistent violations of the liquor and gambling statutes, and repeated convictions under the criminal laws have failed to abate them, the equitable power of injunctive relief is properly granted.

Affirmed.

STREISSGUTH, JUSTICE (concurring specially).

Because of the critical analysis of the trial court's findings contained in the dissenting opinion of Mr. Justice Pirsig, and his conclusion that the findings will not sustain an injunction directed

against the Sportsmen's Country Club, the corporate defendant, much less against the individual defendants, Evelyn Burnip, D. B. Clagett, and Paul Canton, I feel justified in expressing my views by this special concurrence.

So far as the club is concerned, the findings show that it is the lessee of the premises upon which illegal gambling devices were maintained over a period of several years, with knowledge of its officers, and this notwithstanding four distinct raids by the sheriff. In its answer the club admits that in 1940 "it did permit so-called slot machines to be operated on its said premises," its only excuse being "that the operation of same was commonly permitted by the law enforcement authorities of Lac qui Parle County in many public places." The club pleaded guilty to two separate charges of maintaining gambling devices on May 24, 1940, and September 5, 1940, respectively. The court found that the club had a federal liquor stamp but no license to sell either beer or liquor, which of course could not be issued outside of the limits of a village or city. Federal liquor stamps are not required except where the possessor of liquor intends to sell it. Minn. St. 1941, § 340.026 (Mason St. 1940 Supp. § 3965-20), makes it an offense for any person who sells nonintoxicating malt liquor to hold a federal retail liquor dealer's special tax stamp without having an intoxicating liquor license.

These facts and this statute, coupled with the further fact that the club's manager and its employes were found guilty over the same period of repeated unlawful sales of intoxicating liquor, undoubtedly convinced the trial court that the repeated arrests and convictions of the club and its officers and employes were not an adequate means of dealing with the situation and that a writ of injunction was the proper remedy.

The separate answer of Evelyn Burnip, D. B. Clagett, and Paul Canton admits that they were officers or directors of the country club and that "during the year 1940, the then officers of said club permitted certain slot machines to be operated in the club." These

admissions supply any deficiency in the findings of fact and justify the injunction as to them.

The trial court specifically found as a fact that defendant Robert Burnip pleaded guilty to three distinct illegal sales of liquor during the period he was an officer and agent of the club.

By its finding No. X the court specifically found that "the officials of said club saw and knew that beer and liquor were being illegally sold and served in said club, and saw and knew that gambling devices were maintained in said club; that said officials took no official act to stop said illegal sale of beer and liquor and took no official act to have said gambling devices removed."

In my opinion, the findings are not vulnerable to the attack made upon them, and, for reasons adequately stated in the opinion of Mr. Justice Hilton, an injunction was proper.

PIRSIG, JUSTICE (dissenting).

The majority opinion proposes to sustain the lower court on the ground that the club was in fact a public tavern, and that calling it a private club is a "mere subterfuge." The findings of fact of the lower court do not sustain that conclusion.

Inasmuch as the question here turns largely upon the findings, I feel justified in setting out the relevant portions of the findings of fact, conclusions of law, and the court's memorandum. The lower court found that the defendant Anthony, owner of the premises, leased it to the club and received the club membership fees as rental, and, further:

"IV. That said club is not open to the public but only to members and their friends; that membership allegedly is obtained in said club by making application, which said application is approved by the officers of said club and by the payment of a membership fee of $1.00; however, on July 6th, 1939, one Bro[s]vik, a stranger and an investigator, went to said club, made application to the manager of said club, paid a membership fee and was forthwith admitted into said club as a member where he immediately purchased liquor.

160

"V. That the membership of said club consists of business people of the neighboring towns; that there are eight hundred (800) members in said club; that the purpose of said club is social and recreational; that said club has been conducted in a quiet and orderly manner.

"VI. That from the time said club was organized and opened to September 5, 1940, gambling devices have been maintained in said club and gambling permitted; that subsequent to September 5th, 1940, gambling devices have been brought into the said club at the request of members.

"VII. That on March 18th, 1939, July 12th, 1939, May 24th, 1940, and Sept. 5th, 1940, the sheriff of said Lac qui Parle County raided said club and on each raid found gambling devices in said club; that on December 11th, 1940, the said club pleaded guilty to two charges of maintaining gambling devices in said club, one of maintaining gambling devices on May 24th, 1940, and one of maintaining gambling devices on September 5th, 1940.

"VIII. That said club has a federal liquor stamp but has no license to sell beer or liquor; that some members have their own beer and liquor at said club; that it is the policy of said club to sell and furnish beer and liquor to members of said club when said members do not have their own there; that it is the policy of said club to sell and furnish beer and liquor to members of said club whenever said members ask for it.

"IX. That on March 18th, 1939, July 12th, 1939, May 24th, 1940, and September 5th, 1940, the sheriff of said County of Lac qui Parle raided said club and on each raid found large quantities of beer and liquor; that on September 23rd, 1940, said club was convicted of illegally keeping liquor for sale; that on November 8th, 1939, Joseph F. Anthony pleaded guilty to illegal sale of liquor at said club; that on March 25th, 1939, Robert Burnip pleaded guilty to illegal sale of liquor at said club; that on March 25th, 1939, Robert Burnip pleaded guilty to illegal sale of 3.2 beer at said club; that on December 11th, 1940, Robert Burnip pleaded guilty to illegal sale of liquor at said club.

"X. That the officials of said club saw and knew that beer and liquor were being illegally sold and served in said club, and saw and knew that gambling devices were maintained in said club; that said officials took no official act to stop said illegal sale of beer and liquor and took no official act to have said gambling devices removed; that said officials allowed the manager of said club to have the concessions of said club and to make all the profits he could from said concessions."

The conclusions of law were:

"I. That defendant The Sportsmen's Country Club, its agents, officers, servants and employees, and defendants Joseph F. Anthony, Robert Burnip, Evalyn [sic] Burnip, D. B. Claggett [sic] and Paul Canton be and hereby are permanently enjoined from illegally selling or serving beer and liquor in said club and from maintaining gambling devices in said club.

"II. That defendant The Sportsmen's Country Club be and hereby is abated as a public nuisance, and said defendants be and hereby are forever restrained and enjoined from conducting and operating said club."

In the memorandum, made a part of the order, the trial court said in part:

"Apparently any one can go to the manager of the club, pay $1.00 and become a member, the price of the cover charge of a public night club.

"In my opinion the whole affair is a mere subterfuge whereby the laws of the State may be openly and flauntingly disregarded and violated.

"If the State is powerless to remove this cancer from its midst, then indeed the State is impotent and its sovereignty a farce."

There is no finding anywhere that there was any drunkenness or misconduct of any kind, except for the sale of liquor and gambling. There is no finding that the club is near any populated community; that there are any nearby residences, or, if there

were, that they were disturbed by any noise or rowdiness at the club. As far as the findings go, this club may have been many miles from any habitation, and it was conducted in a quiet, peaceful, and decent manner, except that liquor was sold to members and gambling permitted within the private membership of the club. The evidence in the case shows conclusively that the principal function and purpose of the club was recreational; that members went there with their wives and friends for the purpose of hunting, fishing, and trapshooting and to enjoy the meals served there; that whatever gambling took place was intermittent and made available at the express request of the members; and that whatever sale of liquor took place was incidental only to the primary purposes of the club, which were wholly decent and respectable. To say that the conditions enumerated are such as to constitute a public tavern is, to me, a plain distortion of the facts as they appear in the record. Even the state finds it necessary in its brief to say that the second conclusion of law "does not mean that the court intended to forfeit the corporate character and destroy the life of the corporation," and that this court may wish, in affirming, "to clarify this language so as to prescribe more definitely the relief granted and to indicate that no operations may be carried on by defendants on the premises against which the action is directed."

The sole basis for any other interpretation rests upon the memorandum of the trial judge made a part of the order. This is a comment by the trial court plainly not intended to be a finding of fact. It is surmise and opinion, nothing more. It indicates only that had there been any evidence to support a finding that the club was a public tavern the trial court would not have hesitated to so find. He finds on the contrary "that said club is not open to the public but only to members and their friends."

The effect of such a memorandum has been well settled by this court in McGovern v. Federal Land Bank, 209 Minn. 403, 406, 296 N. W. 473, 475, where the court says: "The memorandum of the court may be resorted to in order to sustain findings, but may not

be used to overturn them." See also Sime v. Jensen, 213 Minn. 476, 7 N. W. (2d) 325.

Of still greater seriousness is the utter failure of the findings to sustain the judgment against individual defendants based upon their operation of a public tavern. All that appears with respect to defendant Joseph F. Anthony is that he owns the building leased by the club and receives the membership fees of the club as rental; that he pleaded guilty to the illegal sale of liquor at the club on one occasion nearly a year and a half prior to the present suit. Beyond that the findings as to him are silent. All that we see in the findings with reference to defendant Robert Burnip is that on two occasions prior to the present suit he pleaded guilty to illegal sale of liquor at the club, once on March 25, 1939, and again on December 11, 1940. Yet on this record this court says that these defendants are operating a public tavern.

I have no sympathy for gamblers and liquor law violators, but even their rights and liabilities should be determined by an impartial trial upon the facts found against them, and upon the law applicable thereto. Courts expect no less from administrative agencies. They, themselves, should set the example.

In some parts of the majority opinion, and particularly in the concluding paragraph, the thesis that a public tavern was operated is abandoned, and the decision is placed upon the broad ground that an equity court will grant injunctive relief after repeated convictions have failed to stop the commission of crime. Even this ground does not sustain the findings against defendants Anthony, Evelyn Burnip, Robert Burnip, D. B. Clagett, and Paul Canton. If the final paragraph of the opinion means what it says, it commits this court to a recognition of an equitable jurisdiction far beyond anything permitted by any of the decisions cited in the opinion, and beyond any decision that I have been able to find. It would in effect convert the equity court into an adjunct of our police courts, and would require our district courts to take charge of every habitual drunkard and gambler and possibly other habitual criminal offenders. I do not believe this

164

court is prepared to go to that length, and yet to that length must they go if the lower court in this case is to be sustained.