STATE v. RED OWL STORES, INC., AND OTHERS.
STATE v. GROVES-KELCO, INC., AND OTHERS.
MINNESOTA STATE PHARMACEUTICAL ASSOCIATION, INTERVENOR.

92 N. W. (2d) 103.

July 25, 1958—No. 37,322.

*Miles Lord,* Attorney General, and *William W. Essling,* Special

Assistant Attorney General, for appellant state.

*Loftsgaarden & Loftsgaarden,* for appellant intervenor.

*Charles S. Bellows* and *Best, Flanagan, Lewis, Simonet & Bellows,* for respondent Red Owl.

*Theodor Herman,* for respondent Groves-Kelco.

MURPHY, JUSTICE.

This is an appeal from an order of the District Court of Hennepin County denying the motions of the plaintiff and intervenor for amended findings of fact and conclusions of law or in the alternative for a new trial.

The complaints of the State of Minnesota seek to restrain the defendant corporations and certain of their officers from the alleged violation of certain provisions of M. S. A. c. 151 relating to the subject of pharmacy (L. 1937, c. 354, and amendments). The complaint against the Red Owl Stores, Inc., alleges that it operates a large number of retail food markets; that it is not registered or licensed with the Minnesota Board of Pharmacy to engage in selling at wholesale or at retail drugs and medicines; that it has been unlawfully selling and distributing various "drugs, medicines, chemicals and poisons" in the State of Minnesota, among them being Alka-Seltzer, Anacin, Bromo Seltzer, Bufferin, Pepto-Bismol, Pinex, Murine, Castoria, Ex-Lax, Feen-a-mint, Sal Hepatica, and Vick's Va-Tro-Nol; that such sales are in violation of §§ 151.15[1] and 151.25.[2] The complaint further alleges

---

[1]M. S. A. 151.15. "It shall be unlawful for any person to compound, dispense, vend, or sell at retail, drugs, medicines, chemicals, or poisons in any place other than a pharmacy, except as provided in this chapter.

"No proprietor of a pharmacy shall permit the compounding or dispensing of prescriptions or the vending or selling at retail of drugs, medicines, chemicals, or poisons in his pharmacy except under the personal supervision of a pharmacist or of an assistant pharmacist in the temporary absence of the pharmacist."

[2]§ 151.25. "* * * It shall be unlawful for any person engaged in the business of selling at wholesale, or his agent, to sell drugs, medicines, chemicals, or poisons to other than a pharmacy, except as provided in this chapter."

that such sales are being made in widespread locations over the State of Minnesota and also:

"* * * That to attempt to stop each of such sales would require the expenditure of large sums of money by the State of Minnesota, would require the commencement of a great multiplicity of actions throughout the State and would impose a great burden upon the Courts of this State, all without successfully preventing the continued violation of the provisions of the Pharmacy Law and sections 151.15 and 151.25 thereof."

The complaint further alleges that the conduct of the defendants endangers the public health of the people of Minnesota and renders ineffectual the laws of the state for the protection of public health and asks that the defendant be permanently enjoined and restrained from selling at wholesale or retail drugs, medicines, etc., in violation of the section of the statute quoted, including the drugs named herein.

The complaint against Groves-Kelco, Inc., a corporation, and its officers, contains substantially the same allegations set forth in the Red Owl complaint, with the exception that it admits that the Groves-Kelco company is a wholesale dealer which does not sell at retail but is in violation because of its sale to retail dealers or pharmacies who are not registered retail dealers properly licensed to engage in the sale of drugs under the Pharmacy Act.[3]

The Minnesota State Pharmaceutical Association intervened as a party plaintiff.

The defendant Red Owl corporation interposed an answer admitting that it sells at wholesale and retail the items listed in the complaint. It asserted as a defense that c. 151 and regulations adopted pursuant thereto violate the provisions of Minn. Const. art. 1, § 7, and art. 4, § 33, and are also in violation of the Constitution of the United States, in that the provisions deprive defendant of property without due process of law and create a special and exclusive privilege, immunity, and franchise to pharmacists or druggists, as a result of which a monopoly for the benefit of pharmacists and druggists is created. As a second de-

[3] § 151.25.

fense they asserted that the articles specified are excepted from the provisions of the Pharmacy Act by § 151.26, the fourth paragraph of which provides:

"Nothing in this chapter shall apply to or interfere with the manufacture, wholesaling, vending, or retailing of non-habit forming harmless proprietary medicines when labeled in accordance with the requirements of the state or federal food and drug act; nor to the manufacture, wholesaling, vending, or retailing of flavoring extracts, toilet articles, cosmetics, perfumes, spices, and other commonly used household articles of a chemical nature, for use for non-medicinal purposes."

For a further defense they alleged that the act of the state in attempting to restrain them from selling the articles named is in restraint of trade and in violation of the Sherman Anti-Trust Act, 15 USCA, § 1, et seq., and that the conduct of the State Board of Pharmacy is violative of the Unlawful Business Practices Act, § 623.01, et seq. In their answer to the complaint in intervention the Red Owl corporation asserted the same defenses and alleged a counterclaim against the board in the sum of $25,000.

In its answer to the complaint, the Groves-Kelco corporation and its officers, who are also named as defendants, admitted that in their business as "rack jobber" they sell the drugs referred to in the complaint and asserted substantially the same defenses set out in the answer of the Red Owl company.

From a pretrial order entered pursuant to a conference held September 4, 1956, before the trial court, it appears that the defendant Red Owl and the named individual officers admitted that the corporation is not registered or licensed to sell at retail drugs or medicines; that the defendant corporation "has sold and is now selling at wholesale and at retail in the State of Minnesota" the articles named in the plaintiff's complaint, and that those items are drugs and medicines within the meaning of § 151.01, subds. 5 and 6.

By the same order it appears that the defendant Groves-Kelco, Inc., and its individual officers concede that they had a drug wholesaler's license which terminated June 13, 1955; that the articles referred to in the complaint "are all drugs and medicines within the meaning of the

Minnesota Pharmacy Law, M. S. A. 151.01, subdivisions 5 and 6 thereof." Plaintiff and intervenor admitted that the individual defendants, Elliott F. Royce and Leonard Royce, officers of Groves-Kelco, are pharmacists registered by the Board of Pharmacy of the State of Minnesota.

Both actions were consolidated for trial. At the close of the state's case, defendants rested without introducing evidence. On the basis of the stipulations of facts and evidence adduced at the trial the court found that the Red Owl corporation owns 48 retail stores, referred to as "corporate" stores, and sells merchandise at wholesale to approximately 200 other retail food stores throughout the State of Minnesota, which are known as "Red Owl Agency" stores.[4]

As a part of its findings the court noted that there had been a longstanding disagreement in the interpretation of the law between the Board of Pharmacy on the one hand and the legal department of Red Owl Stores, Inc., on the other as to whether the drugs listed in the complaint were *in fact* "non-habit forming harmless proprietary medicines" excepted from the operation of the act, which disagreement the trial court found had never been determined by the courts of this state.

The court found that the defendant Red Owl corporation "has sold and is now selling at wholesale and at retail in the State of Minnesota," the articles mentioned in the complaint and that neither the corporation nor its officers are licensed by the State Board of Pharmacy to sell drugs or medicines, or to own, operate, or conduct a pharmacy, drugstore, or other place registered by the Minnesota State Board of Pharmacy for the sale of drugs or medicines, and none of the individual defendants is registered or licensed as a pharmacist or assistant pharmacist. As to the Groves-Kelco company, the court found that it had a wholesale drug license but that it sold the products referred to in the complaint to various outlets which were not licensed pharmacies in the State of Minnesota. The court found that each of the items which the plaintiff seeks to enjoin the defendants from selling is a drug and is also

---

[4]There is evidence in the record, however, that the Red Owl sells at wholesale to approximately 500 stores.

a medicine within the definition of the statute.[5]

The court further found, however, that there was no evidence that the sale of any of the items referred to in the complaint endangers the public health and that there is no evidence that any of the items concerned has been, is, or may be harmful to any individual.

The trial court held that under § 151.29[6] violation of the Pharmacy Act was a misdemeanor and that it was the duty of the city attorney of Minneapolis, pursuant to § 151.30,[7] to prosecute the alleged violations referred to in the complaint. The court further held that the remedy provided by criminal prosecution under § 151.29 is exclusive; that the legislature has not authorized injunctive relief to enforce the provisions of the Pharmacy Act; that no attempt has been made by the state to enforce the act by criminal prosecution; and that there is no evidence to prove that a multiplicity of actions would result from enforcement by criminal prosecution. The court concluded that a single prosecution would reach exactly the same number of persons and stores as might be enjoined in this proceeding. The court also found that the defendants are entitled to a trial by jury as to the alleged violations of the provisions

---

[5] § 151.01, subd. 5. "The term 'drug' means all medicinal substances and preparations recognized by the United States pharmacopeia and national formulary, or any revision thereof, and all substances and preparations intended for external and internal use in the cure, mitigation, treatment, or prevention of disease in man or other animal, and all substances and preparations, other than food, intended to affect the structure or any function of the body of man or other animal."

Subd. 6. "The term 'medicine' means any remedial agent that has the property of curing, preventing, treating, or mitigating diseases, or that is used for that purpose."

[6] § 151.29. "Any person violating any of the provisions of this chapter, or rules and regulations hereunder, shall be guilty of a misdemeanor, unless otherwise provided."

[7] § 151.30. "It shall be the duty of the county attorney of the county wherein any offense under this chapter is committed to prosecute the offender, except that when offenses hereunder are committed in cities of the first class it shall be the duty of the city attorney thereof to prosecute the offender. Such prosecutor is authorized to examine the books of any manufacturer or wholesale dealer within the state for the purpose of acquiring information to aid in the prosecution."

of the Pharmacy Act and that these proceedings which seek injunctive relief circumvent the requirements of law and deny to the defendants a trial by which they are entitled to have proof of guilt established beyond a reasonable doubt.

■ Before discussing the issues presented by the appeal, it should be observed that the so-called Pharmacy Act (§§ 151.01 to 151.31) has been considered in a number of previous decisions of this court. Its validity was affirmed in State v. Zotalis, 172 Minn. 132, 214 N. W. 766, in a decision which held that *the legislature in the exercise of police power may in the interest of public health and welfare regulate the sale of drugs and medicines.* That case held that aspirin was a drug within the purview of the law and was not excepted from the provisions of the act as a "non-habit forming harmless proprietary medicine." In State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202, it was held that milk of magnesia was a drug within the purview of the act and not excepted as a "non-habit forming harmless proprietary medicine." The most recent case in which the law is discussed is Culver v. Nelson, 237 Minn. 65, 54 N. W. (2d) 7. There the plaintiff sought a declaratory judgment to establish that the retail sale of vitamins by one not registered as a pharmacist in original packages as prepared by the manufacturer was not a violation of the law. In a decision which held that vitamin preparations are not excepted from the operation of the act as non-habit-forming, harmless, proprietary medicines, the court there reviewed the constitutionality of the act and gathered the previous decisions of this court holding that the legislature may regulate the sale of drugs, medicines, and poisons in the exercise of the police power. State v. Donaldson, 41 Minn. 74, 42 N. W. 781; State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L.R.A. (N.S.) 1272, 10 Ann. Cas. 398; Minnesota State Pharmaceutical Assn. v. State Board of Pharmacy, 103 Minn. 21, 114 N. W. 245; State v. F. W. Woolworth Co. *supra;* State v. Zotalis, *supra.*

■ In support of their contention that the provisions for prosecution of the misdemeanor, §§ 151.29 and 151.30, represent the exclusive remedy reserved to the state for enforcement, the defendants cite numerous statutory provisions to the effect that, where the legislature has intended that equity should lend its aid in support of criminal law,

express provision to that effect has been included in the statute. They point out that courts are reluctant to enforce criminal laws by injunction for the reason that "criminal equity" deprives the defendant of a jury trial and substitutes for the definite penalties fixed by the legislature whatever punishment for contempt a particular court may see fit to exact. They rely principally on Higgins v. Lacroix, 119 Minn. 145, 137 N. W. 417, 41 L.R.A. (N.S.) 737, which case involved an injunction in connection with the operation of a moving picture show without a license. In that case we observed (119 Minn. 152, 137 N. W. 419, 41 L.R.A. [N.S.] 740):

"* * * criminal statutes and ordinances cannot be enforced by injunction. If that were permissible, the constitutional guaranty of trial by jury would be of little avail in many cases."

It is recognized that, where the sole object of the suit is to enforce a criminal statute, courts will not exercise equity jurisdiction.

■ The state relies on Town of Linden v. Fischer, 154 Minn. 354, 357, 191 N. W. 901, 902, involving an action to enjoin an unlicensed dancehall, in which case we stated that, although equity will not ordinarily restrain the commission of a crime by injunction, it will, nevertheless, "interpose its authority in those cases where the threatened act or conduct of the party will amount to a continuing public nuisance as well as a crime. Such would be the result of repeated violations of the by-law in question. It prohibits public dances without a license, and a violation thereof would constitute a crime; at the same time amounting to a continuous public nuisance."[8] The court observed that the punishment

---

[8]§ 616.01. "A public nuisance is a crime against the order and economy of the state and consists in unlawfully doing an act or omitting to perform a duty, which act or omission shall:

"(1) Annoy, injure, or endanger the safety, health, comfort, or repose of any considerable number of persons;

"(2) Offend public decency;

"(3) Unlawfully interfere with, obstruct, or tend to obstruct or render dangerous for passage, a lake, navigable river, bay, stream, canal, or basin, or a public park, square, street, alley, or highway; or

"(4) In any way render a considerable number of persons insecure in life or the use of property."

imposed under the circumstances would be ineffective and have no deterrent effect, "while the strong arm of equity would result in the complete suppression of the evil sought to be avoided." See, also, State v. Nelson, 189 Minn. 87, 248 N. W. 751; People ex rel. Bennett v. Laman, 277 N. Y. 368, 14 N. E. (2d) 439; State ex rel. Bosch v. Denny's Place, 98 Ohio App. 351, 129 N. E. (2d) 532; Corte v. State, 259 Ala. 536, 67 So. (2d) 782; Commonwealth v. Brown, 239 Ky. 197, 39 S. W. (2d) 223; Burden v. Hoover, 9 Ill. (2d) 114, 137 N. E. (2d) 59.

From an examination of the authorities it may be said that, where the acts complained of are violations of the criminal law, the courts of equity will not on that ground alone interfere by injunction to prevent their commission, since they will not exercise their preventive power for the purpose of enforcing criminal laws by restraining criminal acts. However, courts of equity will interfere by injunction to restrain acts amounting to a public nuisance if they affect public rights or privileges or endanger public health, regardless of whether such acts are denounced as crimes. 28 Am. Jur., Injunctions, § 148; 9 Dunnell, Dig. (3 ed.) § 4483a;[9] Miller v. Minneapolis Underwriters Assn. Inc. 226 Minn. 367, 33 N. W. (2d) 48; Fitchette v. Taylor, 191 Minn. 582, 254 N. W. 910, 94 A. L. R. 356.

It is also apparent that the exercise of the court's equity jurisdiction to grant injunctive relief must depend upon the facts in each particular case. The contending parties in the case before us view the issues from entirely different aspects. To the defendants this action is in essence a criminal prosecution instituted under the guise of an action in equity. The state on the other hand contends that this is a civil action to enforce a public health measure and that the criminal aspect is incidental.

It seems to us that the case before us involves something more than

---

[9]Where there have been continuous and persistent violations of liquor and gambling statutes and repeated convictions have failed to abate them, an injunction is properly granted to abate a "public nuisance." State v. Sportsmen's Country Club, 214 Minn. 151, 7 N. W. (2d) 495; State v. Preuss, 217 Minn. 100, 13 N. W. (2d) 774.

the prosecution of a misdemeanor. It involves the question of whether, under circumstances where the state is without an adequate remedy at law to enforce a measure adopted in the interest of public health, equity jurisdiction is suspended, merely because the measure in question makes no provision for an injunction. On the basis of the record before us, there are two parts to this question: (1) Does the misdemeanor provision of the act fail to provide the state with an adequate remedy at law? (2) Do the acts of the defendants constitute a danger to the public health?

■ As to the question of whether or not a criminal prosecution would be effective to avoid a multiplicity of suits, the state calls attention to the policy of the defendants in openly encouraging widespread violation in face of the plain provisions of the law and the decisions heretofore cited. The record shows that the Groves-Kelco company, which sells to approximately 1,200 customers, sent out a circular letter entitled "Important Notice to All Grocers" advising their customers that the Board of Pharmacy "is taking to Court two Minnesota grocery distributors, asking the Court to enjoin all grocery markets from selling many of your Health & Beauty Aids items," including most of the articles referred to in the complaint. In this letter the grocers were advised: "Continue to display & sell these items until a final decision is given by the Supreme Court."

By a letter dated November 6, 1951, the attorney for the defendant Red Owl corporation advised the manager of one of their stores that: "We have engaged in a running battle with the State Board of Pharmacy and the Attorney General's Department here in Minnesota for the last several years * * *. It is our interpretation of the law that we are permitted to handle these items regardless of what they say. Accordingly, continue to carry these items and advise me in the event any official tells you otherwise."

The record contains numerous communications to agency managers advising them: "Rest assured that if an action is brought, although you will be the party named in the complaint, that it will be at no expense to you." And on May 10, 1954, a communication was directed to all agency operators, sales managers, corporate store managers, and corporate district and divisional managers advising them: "In the event a complaint

is issued or any legal action taken against you, do not plead guilty, but get in touch with us by telephone and we will advise what procedure you should follow. In some instances, arrests have been made and the store manager or agency operator has entered a plea of guilty before we have been informed—do not enter any such plea, but enter one of not guilty or ask the Justice of the Peace or the Court before which you appear to hold the matter over until you can talk with our Legal Department." The policy of the defendant Red Owl company is best revealed by the testimony of one of its executives. He was asked:

"Q.   Then is it correct, sir, that the policy of the defendant, Red Owl, is that it does not make any difference whether the agency stores have a license from the Board of Pharmacy or not?

"A.   I think that's right.

"Q.   And you have, and your department has advised these agency stores when the problem has arisen?

"A.   Yes, we have.

"Q.   None of your corporate stores have any licenses from the State Board of Pharmacy to sell drugs and medicines, do they?

"A.   No.

"Q.   As a matter of fact whenever any of the agency stores have corresponded with you or your department regarding the attempted enforcement of the pharmacy law by the pharmacy inspectors, you or your department has advised them to go ahead and sell these items of drugs and medicines, have you not?

"A.   We have.

"Q.   And you have done that in spite of the fact that the inspection division of the Board of Pharmacy has ordered these agency stores to stop selling these items of drugs and medicines?

"A.   We certainly have.

"Q.   And as a matter of fact whenever the problem has arisen or been raised by any member of your agency department, or the agency stores, you have advised the agency store operators that the legal department of Red Owl would defend the agency store in any charge brought against them by the State Board of Pharmacy respecting the sale of these drugs and medicines, isn't that right?

"A.  I think we have, although I can't recall it specifically, but we certainly would."

On the basis of this evidence the trial court was of the view that one prosecution in the city of Minneapolis would accomplish the same result as an injunction. We do not think the record warrants any such conclusion. Aside from the admitted policy of defendant Red Owl to contest enforcement wherever it is instituted, the defendant Groves-Kelco, in oral argument before this court, gives us to understand that rather than have a decision which would resolve the questions of law raised by the pleadings they insist upon a jury trial requiring proof beyond a reasonable doubt as to each particular violation. While courts jealously protect the constitutional rights of those charged with criminal offenses, respect for due process does not require that the courts in every instance should ignore other considerations merely because the act complained of may constitute a misdemeanor. The nuisance aspect of the act sought to be enjoined may be considered,[10] as well as its social consequences. Here we are dealing not with an individual charged with an isolated offense but with an alleged widespread violation of a misdemeanor statute which penalizes breach of a law enacted to protect the public health. It should be recognized that for the state to undertake

---

[10]If the legislature had authorized injunctive relief, as it might well have done, the defendants could not be heard to say that the injunctive method of enforcement deprives them of right of trial by jury with its burden upon the state to prove guilt beyond a reasonable doubt. It is also apparent that if the legislature had omitted to provide in the act for either criminal or civil sanctions, injunctive relief would be proper. In State ex rel. Goff v. O'Neil, 205 Minn. 366, 370, 286 N. W. 316, 318, a case which involved an injunction against a small loan company which was loaning money at usurious rates to necessitous people, we said:

"* * * It is conceded that our statutes forbidding the taking of usury do not subject the transgressor to a penalty by way of imprisonment or fine. So there is no remedy for usury under the criminal law."

We held, accordingly, that the continuous violation of the usury statute constituted a public nuisance and warranted issuance of an injunction.

See, First State Bank v. Chicago, R. I. & P. R. Co. (8 Cir.) 63 F. (2d) 585, 590, 90 A. L. R. 544, 551: "If prevention of multiplicity of suits confers equitable jurisdiction, no right to a jury trial exists."

to prosecute each violation in face of resistance over a great area of the state would in effect set at nought the effective and uniform enforcement of the act.

While it is true that the legislature has not provided for injunctive relief, that fact should not place the pharmaceutical board in a position where, in the face of organized resistance, it must rely on one prosecution at a time to accomplish enforcement. We think that under the circumstances it was the duty of the attorney general as an agent of the state to institute injunctive proceedings to accomplish that purpose.

A helpful authority on this point is the memorandum in State v. Luross written by Mr. Justice Knutson of this court while he was district judge of the fourteenth judicial district. That case presented the question of whether or not a court of equity would enjoin a chiropractor from continuing his practice without benefit of a certificate of registration in the basic sciences as provided by law. There, as here, there was no statute expressly conferring upon a court of equity the power to enjoin for mere failure to procure a license. While in that case there had been a prior conviction of the defendant, in the case before us we have the admitted policy of the defendants to continue and encourage widespread resistance to enforcement. In granting the injunction, Mr. Justice Knutson said:

"* * * By enacting laws requiring such license as a prerequisite to practicing the art of healing our Legislature has established the public policy that it is injurious to health to permit anyone to practice without a license. If these laws are to have any effect, anyone who has not shown himself qualified by passing the required examination must be prevented from so practicing. How else can this be done than by an injunction? That the penal provisions of the law are ineffective has been effectively demonstrated by the defendant himself."

Recognizing that ordinarily a court of equity will not enjoin the commission of a crime, he stated:

"* * * the mere fact that the act, or series of them, constitutes a crime, does not bar injunctive relief if otherwise there are grounds for it. (Fitchette v. Taylor, 191 Minn. 582, 584.) * * * If it is a case in which, in any way, an injunction is the proper remedy, it should be

issued, not to punish him for a violation of the statute but to prevent him from unlawfully engaging in those acts which the statutes seek to prevent for the protection of the public."

The cases of Commonwealth v. Brown, *supra,* and Burden v. Hoover, *supra,* express the same reasoning. The statute here was not passed for the purpose of punishing crime; it was primarily enacted for the protection of the public health and welfare, and the criminal sanction included in the act was intended as a deterrent for the purpose of admonishing those engaged in the sale of drugs that they must comply with the terms of the statute and regulations. Under the circumstances the pharmaceutical board could make little progress toward enforcing the act if it was limited to prosecutions to recover the small penalties provided. Upon the record we are satisfied that the state's evidence is sufficient to establish, without evidence to the contrary, that the remedy at law is inadequate.

While the record is not as adequate as it might be with reference to danger to the public health, that defect is not entirely the fault of the state. The state attempted to introduce evidence as to the manner of the sale of drugs by self-service method in grocery stores and supermarkets. The trial court sustained an objection to this line of evidence, taking the view that the manner of sale had no bearing on the question of injury to the public health and welfare. We think that the court unduly restricted the state in this respect.

It appears that the Board of Pharmacy had adopted regulations 15, 18, and 19 applying to the sale of drugs in "super stores or super markets, or self-service stores, or similar establishments," by which regulations the registration or granting of license to any pharmacy is withheld where the product is sold in an area not under the supervision of a pharmacist or assistant pharmacist and under circumstances where the purchaser is permitted to serve himself. In support of its contention that the manner of sale of drugs in self-service stores presents a danger to the public health, the state calls attention to the admitted character of the products sold as evidenced by the printed labels on the containers. It points out, for instance, that the Bromo Seltzer label contains the caution: "Do not exceed two doses in twenty-four hours. In persistent

or frequent Headaches, Upset Stomach or Neuralgia, consult your physician. Not for use by children"; and that: "If rash, drowsiness in daytime, or any unusual symptoms occur, discontinue use at once. Not for use by those having kidney or other organic disease, unless advised by physician. Do not exceed recommended dosage; overly frequent and continuous use may result in serious effects." The state also points out that the inherent dangers in the taking of certain of the drugs listed in the complaint are indicated by warnings contained on the labels that in certain circumstances they are to be taken as directed by a physician; this applies to Sal Hepatica, Anacin, Bromo Seltzer, Bromo Quinine, and Pepto-Bismol, among others. We think that the state should have been permitted to present whatever evidence it may have had to show what danger, if any, the uncontrolled and unsupervised sale of these articles presented to the public health. But, even conceding that the state has not on the record established evidence of *specific* harm to the public, we are of the view that the state has a prima facie case, in view of the public policy in our state that the uncontrolled sale of drugs and medicines is inimical to public health. This policy has been enacted into law in c. 151. It must be conceded that the subject of public health is deeply involved with the sale of all drugs. State v. Zeno, 79 Minn. 80, 81 N. W. 748, 48 L. R. A. 88. In State v. Zotalis, 172 Minn. 132, 133, 214 N. W. 766, which involved the sale of aspirin, we said:

"The legislature thought that the dangers incident to its [aspirin] sale justified regulation and that a restriction of sales to pharmacists or to those under their supervision was effective. It is true that no technical skill is required in making a sale. * * * the pharmacist knows where to procure a pure and genuine article and his prescribing physicians will require him to furnish a pure drug."

Expanding on the same reasoning, we said in Culver v. Nelson, 237 Minn. 65, 78, 54 N. W. (2d) 7, 14:

"Not only is a pharmacist in a better position to know where to procure a pure and genuine article, but he is equipped by training and education to know and advise prospective purchasers what products contain vitamins they seek in the best combinations. * * * A pharmacist is equipped by training to know how best to preserve the beneficial

qualities of these products."

In light of the admitted facts as established by the record and the manifest policy of the legislature which prohibits the uncontrolled sale of drugs, it is our view that a prima facie case was established, as a consequence of which there fell upon the defendant the burden of going forward with the evidence. We conclude that the trial court erred in determining that the state had not made out a prima facie case on the question whether the facts established a present condition inimical to the public health. State ex rel. Missildine v. Jewett Market Co. 209 Iowa 567, 228 N. W. 288; 43 C. J. S., Injunctions, § 124.

The real issues in this case, which affect substantial business interests of the defendants as opposed to an important concern of the state in the area of public health, were never reached. We think the method adopted by the attorney general in resolving those opposing interests was appropriate.

■ One further point remains for consideration. It is the contention of the defendants that the state failed in establishing the burden of proof to the effect that the drugs in question were not "non-habit forming harmless proprietary medicines" within the exception of the act. The defendants asserted as an affirmative defense in their answers that the drugs referred to came within the exception. Where, as here, the exception appears in a different section from that containing the enacting words of the statute, the party relying upon the statute need not allege facts showing that the present case does not come within the exception, such allegations being matters to be pleaded and proved by the opposing party. See, Annotation, 130 A. L. R. 443; Faribault v. Hulett, 10 Minn. 15 (30).

Other questions presented by the briefs were never reached in the court below and, accordingly, do not require discussion.

Reversed and new trial granted.

DELL, CHIEF JUSTICE (dissenting).

Conceding that a trial court may not act arbitrarily and without limitations in the matter of granting or denying injunctions,[11]

---

[11]Currie v. Silvernale, 142 Minn. 254, 171 N. W. 782.

it is nevertheless well settled that the allowance or disallowance of injunctive relief rests largely within judicial discretion.[12] "If upon the facts the trial court could reasonably have found either way, * * * [this court is] not at liberty to interfere."[13] When this case came before the trial court it was first called upon to determine whether or not, from a procedural standpoint, an injunction was the appropriate remedy. It decided this issue in the negative and denied the injunction. In my opinion, its decision should be sustained.

Two requirements must be satisfied in order to justify the issuance of an injunction: (1) The injury threatened must be real, substantial, and irreparable[14] and (2) the remedy at law must be inadequate.[15] It appears to me that on neither ground has the state made out its case.

There has been no showing of any injury, past, present, or future; real, substantial, or irreparable. The majority opinion admits that the state failed to present a single instance in which the use of any item enumerated in the complaint, purchased in a grocery store or supermarket, injured the safety, health, comfort, or welfare of anyone. The state's only attempt to prove the dangerous qualities of this merchandise was its reference to the precautionary instructions on some of the labels. These are no different from the directions which accompany numerous other products which are sold every day and which no one would seriously contend are injurious to health and safety.

Nor has there been any showing that the state's legal remedy is inadequate. The statute itself sets forth a simple and direct method for handling violations. They are made misdemeanors by M. S. A. 151.29, and § 151.30 imposes a duty upon county attorneys to prosecute offenders. I agree with the trial court that a single criminal prosecution, with the right of appeal to this court for final determination, would adequately dispose of the matter. This was the manner in which the state always proceeded in this type of case,[16] and it would have afforded

---

[12] 9 Dunnell, Dig. (3 ed.) § 4490, and notes 7 and 8 thereto.

[13] Standard Oil Co. v. Bertelsen, 186 Minn. 483, 487, 243 N. W. 701, 703.

[14] 9 Dunnell, Dig. (3 ed.) § 4470, and cases cited under note 23.

[15] 9 Dunnell, Dig. (3 ed.) § 4472.

[16] State v. S. S. Kresge Co. 184 Minn. 59, 237 N. W. 820; State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202; State v.

defendants an opportunity to have a trial by jury.[17] Surely, the adequacy of the legal remedy is not to be tested by the state's inability, real or imagined, to prevail in a criminal prosecution.[18]

An injunction will not issue to enjoin purely criminal acts.[19] It is only where criminal prosecutions have been wholly ineffective, and where repeated convictions have failed to deter violaters, that equity will interpose its jurisdiction.[20] Upon this principle the injunction proceedings herein were premature. There has never been a criminal prosecution. Nor is there any showing at all that defendants would persist in violating the statute if they were convicted and the state's assertion to that effect is mere speculation. Moreover, defendants' decision to continue marketing these items does not indicate any disregard of the law. Until it is definitely determined by the courts that these sales violate the statute, they are within their rights to sell them. Their further decision to provide legal assistance to any of their outlets

---

Zotalis, 172 Minn. 132, 214 N. W. 766; State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L.R.A. (N.S.) 1272; State v. Donaldson, 41 Minn. 74, 42 N. W. 781.

[17]See, Bankers Reserve Life Co. v. Omberson, 123 Minn. 285, 143 N. W. 735, 48 L.R.A. (N.S.) 265; Higgins v. Lacroix, 119 Minn. 145, 137 N. W. 417, 41 L.R.A. (N.S.) 737.

[18]See, Higgins v. Lacroix, 119 Minn. 145, 137 N. W. 417, 41 L.R.A. (N.S.) 737.

[19]Miller v. Minneapolis Underwriters Assn. Inc. 226 Minn. 367, 33 N. W. (2d) 48; Higgins v. Lacroix, 119 Minn. 145, 137 N. W. 417, 41 L.R.A. (N.S.) 737.

[20]In State v. Sportsmen's Country Club, 214 Minn. 151, 157, 7 N. W. (2d) 495, 498, we said: "* * * where there have been continuous and persistent violations of * * * statutes, and repeated convictions under the criminal laws have failed to abate them, the equitable power of injunctive relief is properly granted." The injunction issued because seven convictions had done no good. And see, State v. Preuss, 217 Minn. 100, 13 N. W. (2d) 774 (injunction allowed after 19 convictions were of no avail); State v. Luross, Dist. Ct. 14th Jud. Dist., April 9, 1942, Oscar R. Knutson, district judge (after one conviction failed to deter defendant from practicing medicine without a license, he was again arrested, but could not be brought to trial because on the dates set therefor he was in a hospital although at other times he continued to violate the statute).

which might be prosecuted is consonant with the theory that a party is entitled to present the best possible case to the court and to advance the soundest arguments available in its support.

The cases cited in the majority opinion are inapplicable. They fall into two categories which are clearly distinguishable from the instant case: (1) Instances where the statutes specifically provided for injunctive relief in lieu of a criminal prosecution[21] and (2) cases upholding injunctions because no specific statutory prohibition was applicable other than the public nuisance provisions of §§ 616.01 and 616.02 and prior statutes or provisions similar to § 613.78.[22] In the instant case, however, there are *both* a declared criminal violation *and* a declared method of enforcement which should be exhausted before attempting to proceed by injunction.

Nor do I agree with the state's contention that only by securing injunctive relief can a multiplicity of actions be avoided. Only parties to the action may be bound by an injunction.[23] There are other wholesalers and supermarkets besides the defendants. It seems equally clear that it might be necessary to institute proceedings against each and every one of them in order to reach the result desired by the state. Since in my opinion there was no showing of a real, substantial, and irreparable injury or that an adequate legal remedy was unavailable, and since there was no danger of a multiplicity of actions if an injunction did not issue, I think the trial court properly exercised its discretion in denying the injunction.

What has been said heretofore applies solely to the procedural aspects of the case. There are other considerations which justify comment upon

---

[21]Fitchette v. Taylor, 191 Minn. 582, 254 N. W. 910, 94 A. L. R. 356 (see, L. 1931, c. 114, § 1[e]).

[22]State v. Nelson, 189 Minn. 87, 248 N. W. 751; State ex rel. Goff v. O'Neil, 205 Minn. 366, 286 N. W. 316 (no statutory penalty or fine for usury); Town of Linden v. Fischer, 154 Minn. 354, 191 N. W. 901 (no statutory penalty for violating town bylaws; M. S. A. 617.54, making the unlawful operation of a dance hall a misdemeanor, was enacted after the decision).

[23]Chamblin v. Schlichter, 12 Minn. 181 (276); Kean v. Hurley (8 Cir.) 179 F. (2d) 888.

the merits. If it is true that it is inherently dangerous for the public to be able to purchase drugs in a self-service fashion, then it is apparent that curing the alleged evil which now occurs in supermarkets and grocery stores solves only part of the problem. We cannot shut our eyes to the fact that almost any item which does not require a prescription may be purchased in the same manner in a drug store without any restriction at all upon its quantity. Moreover, it is a matter of common knowledge that in many instances it is not a pharmacist who dispenses the merchandise but rather an inexperienced employee or the customer himself in a self-service manner. If this be the case then what we said in State v. Zotalis, 172 Minn. 132, 133, 214 N. W. 766, applies here with equal vigor:

"The statute should be sustained if enacted with reasonable reference to public health or welfare. If intended merely to give a monopoly to pharmacists or druggists by restricting sales to them it is not sustainable. It is only sustainable as a police measure."[24]

Since the decisions in the Zotalis case and in State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202, much new light has been shed upon drugs by medical science. Many of them are in common use in nearly every household without consulting a physician or pharmacist before using them. The underlying policy which motivated the conclusions reached in the cited case, therefore, might well be reexamined. A criminal prosecution appears to me to be the proper place to do so. Accordingly I dissent.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.

---

[24]And see, State v. Donaldson, 41 Minn. 74, 82, 42 N. W. 781, 783.