STATE v. RED OWL STORES, INC., AND OTHERS.
STATE v. GROVES-KELCO, INC., AND OTHERS.
MINNESOTA STATE PHARMACEUTICAL
ASSOCIATION, INTERVENOR.

115 N. W. (2d) 643.

February 9, 1962—No. 38,153.

34

*Walter F. Mondale,* Attorney General, and *William W. Essling,* Special Assistant Attorney General, for appellant state.

*Loftsgaarden & Loftsgaarden,* for appellant intervenor.

*Charles S. Bellows, Harold C. Evarts,* and *Best, Flanagan, Lewis, Simonet & Bellows,* for respondent Red Owl.

*Theodor Herman,* for respondent Groves-Kelco.

MURPHY, JUSTICE.

This case comes to us on appeal from an order denying a new trial and from judgments entered for defendants in proceedings in which the State of Minnesota and the Minnesota State Pharmaceutical Association, hereinafter referred to as the association, sought to enjoin the sale of certain prepackaged trade-name drugs and medicines by defendants who are not licensed under the provisions of Minn. St. c. 151. This case was originally before us in State v. Red Owl Stores, Inc. 253 Minn. 236, 92 N. W. (2d) 103. It is unnecessary to again state the involved setting in which the issues were originally presented to the trial court. It is sufficient to say that on review of the first action, in which similar relief was sought, we said (253 Minn. 252, 92 N. W. [2d] 114), "The real issues in this case, which affect substantial business interests of the defendants as opposed to an important concern of the state in the area of public health, were never reached." We returned the matter to the district court for a new trial.

The issue bearing on the right of the state and the association to injunctive relief has now been fully presented. During a trial which

lasted 14 weeks the court heard evidence from numerous witnesses for both the plaintiffs and the defendants, including distinguished experts in the fields of pharmacology, medicine, and chemistry. We have before us a lengthy record with complete findings of fact by the trial court, accompanied by an able and exhaustive memorandum on every aspect of the issues involved. Two issues are presented: (1) Do the facts warrant injunctive relief? (2) Are the drugs in question exempted from the application of the Pharmacy Act?

As to the first issue the court found that the defendants were engaged in selling at either wholesale or retail, without benefit of a license from the board of pharmacy, certain prepackaged medicines known by the trade names of Bromo Seltzer, Anacin, Aspergum, Thrifty Spot Aspirin Compound Tablets, Alka-Seltzer, Bufferin, 4-Way Cold Tablets, Bromo Quinine, Pepto-Bismol, Pinex, Vick's Cough Syrup, Vick's Va-Tro-Nol, Murine, Castoria, Ex-Lax, Feen-a-mint, Sal Hepatica, and Lysol.

The evidence on behalf of the state and the association lays great stress upon the character of these products as toxic drugs and they seek to establish that there is a danger to the public health by reason of unsupervised sales in supermarkets and other unlicensed outlets where the drugs are dispensed at self-service counters. The thrust of their case seems to be that, because these packaged drugs and medicines, when used in excessive dosages, may be harmful to the person taking them, their sale at unlicensed places constitutes a danger to the public health.

In order to determine the application of the provisions of c. 151 to the drugs in question, something should be said as to the nature and character of the ingredients in them and their effect upon the structure and function of the human body.

From the record it appears that *Bromo Seltzer* has as its ingredients acetanilid, sodium bromide, and caffeine. Acetanilid acts at the base of the brain and on the nervous system to produce relief from minor aches and pains. Its toxic effects are manifested chiefly in the circulation and, if taken in excessive doses, may cause destructive injury to the red blood cells and act as a depressant upon the heart and blood vessels. Sodium bromide is a hypnotic or sleep-producing drug and

in ordinary dosages produces a depressant or dulling action upon the entire brain. This ingredient is counteracted by caffeine, which is used for its alerting or awakening effect upon the brain. Sodium bromide may induce a chronic state of drug intoxication, inducing confusion, memory loss, and skin lesions. In large quantities it may produce death. The drug also contains sodium bicarbonate and citric acid, which when dissolved form sodium citrate. These latter ingredients are used as a vehicle for ingestion and, when diluted with water, cause an effervescence to make the drug more palatable.

The active ingredients of *Anacin* are acetophenetidin, aspirin, and caffeine. Acetophenetidin is described as an analgesic pain-relieving drug very much like acetanilid. Aspirin, acetylsalicylic acid, is also a pain-relieving drug. The dulling of the brain produced by acetophenetidin and aspirin is counteracted by caffeine. Large enough doses of acetophenetidin would result in respiratory paralysis. In large doses aspirin may remove normal alkali from body fluids and result in a type of acidosis which can lead to a marked increase in respiration. This condition of acidosis which might result from excessive consumption of large quantities of the drug "can injure the brain, the kidney and the heart and death can occur in a convulsive phenomena during this acidosis if it is not relieved."

The active ingredient of *Aspergum* is aspirin. The medical complaint to that particular drug is that it is used by children, and children require a much smaller dose than an adult. Medical opinion is that the better way to determine the dosage of this drug is on a weight basis.

*Thrifty Spot Aspirin Compound Tablets* contain acetophenetidin, aspirin, and caffeine.

The significant ingredient of *Alka-Seltzer* is aspirin. It is combined with monocalcium phosphate, sodium bicarbonate, and citric acid, which serve as a medium for neutralizing excess acid in the stomach. The combination of aspirin with the other ingredients does not change its character or function.

The active ingredient of *Bufferin* is aspirin. Here it is combined with aluminum glycinate and magnesium carbonate, which act as an antacid.

The significant ingredients of *4-Way Cold Tablets* are magnesium

hydroxide, yellow phenolphthalein, and aspirin. Magnesium hydroxide is an antacid. Yellow phenolphthalein is a cathartic. Magnesium hydroxide can combine with acids in the system thereby lessening possible irritation to the stomach. Yellow phenolphthalein is considered a toxic ingredient, the frequent or excessive use of which may produce irritation or damage to the gastrointestinal tract or result in infection. Dr. J. A. Bargen, chairman of the department of gastroenterology of the Mayo Clinic, expressed the following medical objections to the use of this type of medicine:

"Well, the dangers are principally two. Laxatives of all kinds are apt to be used promiscuously and an individual who might have an attack of appendicitis by taking laxative inopportunely might suffer some real danger such as perforation. But to me, much more the serious effect is the custom of people taking laxatives habitually and over a period of time, causing what we speak of as an irritable colon, which comes in individuals very frequently when they have taken laxatives for a long time."

The ingredients of *Bromo Quinine* are phenacetin, extract of belladonna, extract of hyoscyamus, quinine hydrobromide, caffeine, and yellow phenolphthalein. Belladonna contains an alkaloid, atropine, designed to decrease the secretions in the body during a cold. Extract of hyoscyamus contains hyoscine, another alkaloid similar in action to atropine. Excessive use of these ingredients can produce symptoms of delirium and excitement from stimulation of the brain and eventually convulsion and death. Quinine, which has the reputation of lowering an elevated body temperature, may in excessive quantities produce a circulatory collapse. The cathartic action of this particular preparation admittedly has no relation to the cure or relief of a common cold. The expert who testified for the manufacturer described this property of the drug as a form of faith healing or "laying-on of hands."

*Pepto-Bismol* contains bismuth subsalicylate, which has a soothing effect on the lining of the gastrointestinal tract. It also contains salol and zinc phenolsulphonate, which are weak antiseptics. They are calculated to destroy micro-organisms which might be present in the gastrointestinal tract. Phenol is another name for carbolic acid and, when

absorbed in large enough doses, can produce phenol poisoning. The particular medical complaint about the use of this drug is that the relief it brings may delay diagnosis or treatment where the person taking it actually suffers from ulcers or cancer.

*Pinex,* which is intended for relief of coughs and bronchial irritation as a result of colds, has as its active ingredients alcohol, chloroform, potassium guaiacol sulphonate, oil of pine tar, oil of eucalyptus, extract grindelia, and glycerin. It appears that the chloroform serves to paralyze the small filaments on the mucous membranes of the respiratory tract. Potassium guaiacol sulphonate increases secretions from the respiratory tract and helps to wash out or eliminate the product of infection. Oil of tar and oil of eucalyptus are intended to perform the same function. There is medical opinion from Dr. John F. Briggs[1] that chloroform is a "potentially harmful and potentially dangerous" anesthetic, which interferes with the ciliary movement of the cells in the bronchial tree so that excretions may be held back in the lung and the sedative effect of the antiseptic may mask other diseases.

The active ingredients of *Vick's Cough Syrup* are sodium citrate, ammonium chloride, glycerin, cetamium, eucalyptus, menthol, and camphor. Sodium citrate and ammonium chloride are used in treatment of acute bronchitis. They help wash out products of infection and increase secretion from the respiratory tract. Dr. Briggs was of the opinion that ammonium chloride is "an extremely dangerous drug." It is used in this mixture as an expectorant and when used in excessive doses alters the chemical balance of the body, producing an acidosis which might be "extremely dangerous" to anyone with kidney disease. There was medical opinion that eucalyptus is potentially dangerous in that it gives the patient a feeling of "clearing of the nasal passage which is false, because of its local effect on the nasal mucosa." Camphor is potentially dangerous and has produced poisoning when taken in minute doses by people sensitive to the drug.

---

[1]Dr. Briggs is an internist and former chairman of the American Medical Association section on diseases of the chest, a former chairman of the cardiovascular committe of the American College of Chest Physicians, and associate professor of clinical medicine at the University of Minnesota.

The most important ingredients of *Vick's Va-Tro-Nol* are ephedrine, an alkaloid which will shrink the nasal mucous membrane, menthol, eucalyptol, camphor, and methyl salicylate. This preparation is intended to be dropped into the nose for the treatment of the common cold. Its ingredients other than ephedrine are described as "volatile oils which are mildly antiseptic" and inhibit the growth of micro-organisms in the nose. Ephedrine is a drug which may produce a rapid heart action, increase blood pressure, and has a vasoconstrictive effect on the small arteries of the body. It is particularly dangerous for persons with high blood pressure or goiter or who are sensitive to adrenalin. The oil base of the medicine may enter the lung, resulting in "lipoid or oil pneumonia" which may have serious consequences. Camphor can also produce the same drug reactions.

In discussing the ingredients in these preparations for the relief of colds, Dr. Briggs stated:

"* * * I have seen the following things happen with the use of these ingredients without an underlying cause. First a patient with tuberculosis in the minimal form have had symptomatic relief from the use of these ingredients, with the result that the tuberculosis goes on into a very advanced stage, and of course in doing so may become an infected lesion and not only harm the person himself by delaying treatment for his tuberculosis, but also he may spread the disease to his associates and to his friends and to his family. I have seen these drugs suppress a cough in an individual who has had a cancer of the lung or of the larynx or of the respiratory passage, and in suppressing such coughs they have delayed their diagnosis until harm has come to them, and we have seen the same thing occur with a foreign body in the lung, delay the diagnosis because you relieved a symptom and not the disease, and we have seen patients who have enjoyed the cough mixture so much that they have become habituated to it and enjoy taking the cough medicine because of these ingredients."

The dosages and directions contained on the labels do not sufficiently take into consideration a person's idiosyncrasy to the drug, his age, size and weight, general state of health, past history, or biological make-up. Dr. Biggs, however, was without specific information as to

the quantity of the ingredients in these particular mixtures nor did he have personal knowledge of any instances of harm resulting from use of these medications.

Two significant ingredients of *Murine,* an eye wash, are boric acid and potassium borate, which are drugs having toxic properties.

*Castoria* is a special laxative for infants and growing children. It does not appear that this particular drug would affect adults unless taken in quart doses. These is no evidence that toxic effects have developed from this preparation.

The active ingredient of *Ex-Lax* is yellow phenolphthalein. The toxic properties of this drug have already been discussed in connection with 4-Way Cold Tablets and Bromo Quinine. Medical literature contains instances of poisoning from use of this product. Medical opinion is that there is a risk of excessive use of this preparation by children because it is prepared in a form resembling a Hershey chocolate bar.

The active ingredient of *Feen-a-mint* is also yellow phenolphthalein, and what is said with reference to other drugs containing that ingredient applies here.

*Sal Hepatica* is an effervescent saline laxative containing sodium sulphate, citric acid, and sodium phosphate. Medical literature contains information to the effect that salines taken daily for "rather long periods of time" may result in acute obstructions in the gastrointestinal tract and require surgery.

*Lysol* is an antiseptic or disinfectant solution having as its active ingredients orthohydroxydiphenyl and cresylic acid, or cresol. It is efficient as an antiseptic or disinfectant on utensils or other inanimate objects. When taken into the human body it may have toxic effects.

The findings recite that since August 1948 "there has existed a bona fide disagreement between the defendants and the Minnesota State Board of Pharmacy and between defendants and the Attorney General as to the construction and interpretation of the Pharmacy Act, Chapter 151 Minn. Stats. 1957." The court found that, even though each of the trade-name products is a drug and a medicine as defined in the Pharmacy Act, nevertheless, there never has been any attempt on the part of the defendants to evade the law and that they acted "in the sincere belief that their sale of these trade-named prod-

ucts has not been prohibited by the Pharmacy Act." The trial court viewed the litigation not as a proceedings brought in the interests of the public health but as an economic dispute between the drugstore owners and the supermarkets. The court found: "That the Minnesota State Board of Pharmacy has recognized that the sale of these trade-named products by non-pharmacists such as defendants constitutes serious economic competition for the pharmacists; that concern over such increased competition is a motivating factor in this action; that one of the manifest purposes of this litigation is the curtailment or restriction of free competition in the sale of medicines."

The court further found that each of the named products has been sold in both drug and nondrug outlets in large volumes throughout the United States since first manufactured; that on the average, "the percentage sold in non-drug outlets is in excess of 50%; that, as a matter of common knowledge, drugs and medicines of a nature similar to these trade-named products are sold freely without any attempt at supervision by the pharmacists and often without contact with any pharmacist on the part of the purchaser." The court further found that there are 1,540 nondrug "permit" stores which operate in every county in the State of Minnesota; that "these stores consist of virtually every conceivable type of retail outlet from general store to cafe, tavern and service station; and that from this record no harm has ever resulted to the health of anyone from sales of these trade-named products through these outlets."[2] The court found that the state and the as-

---

[2] The permits to which the finding referred are issued pursuant to Minn. St. 151.26, relating to exceptions, which provides in part:

"The board may, upon application and the payment of an annual registration fee not to exceed $5, register stores, other than a pharmacy, in any incorporated or unincorporated village wherein no pharmacy is located, or in any township wherein may be sold ordinary household drugs, chemicals, and poisons for medicinal purposes designated by the board, prepared in sealed packages by a licensed pharmacist qualified under the laws of the state wherein he resides. The name and address of such pharmacist or the manufacturer shall appear conspicuously on each package. It shall be unlawful for any such store to sell such medicinal drugs, chemicals, or poisons without first having secured such license. It shall be

sociation had not established that the sale of these products in non-drug outlets had in any way endangered the public health but on the contrary found "[t]hat convenient access to common remedies, such as these trade-named products, to which the public has long been accustomed is a public health benefit." The court further found that the drugs in question were nonhabit forming and that their sale did not affect or endanger the public health, and it concluded that, if the act is to be enforced, the state must resort to the criminal procedures which the act provides.

These findings were made after a careful review of many days of testimony from expert witnesses. Witnesses for the state and the association testified at length as to the inherent and potential dangers of the ingredients contained in the drug products involved. None of these witnesses had firsthand knowledge of any instance where any person purchasing these products either at drugstores or other outlets and using them in accordance with the recommended dosages contained on the labels had sustained injury. There are but two specific instances of harm resulting from the use of these products which are found in the record. The first relates to the experience of a 2½-year-old child who was riding in a grocery cart while his mother was shopping at a Red Owl supermarket in Duluth. Along with her purchases the mother had placed in her cart a package of Ex-Lax which she took from a self-service shelf. While she was making other purchases, another customer informed her that the child was eating the Ex-Lax and advised her to take him to a doctor. It was found that the child sustained abdominal cramps and spasms. His stomach was pumped, after which the boy apparently recovered without any serious results. The doctor who attended the boy testified that yellow phenolphthalein contained in the drug may cause a chemical enteritis and inflammation of the intestine which in some cases is so severe it requires hospitalization. The other specific evidence of harm related to the experience of a Minneapolis businessman who entered a drugstore in that city to purchase Bromo Seltzer. The pharmacist in attendance observed from

---

lawful for a person engaged in the business of selling at wholesale, or his agent, to sell such articles to such registered places."

the physical appearance of the customer that he was ill and suggested that he see a physician. It appeared that the customer had been in the habit of taking Bromo Seltzer for a long period of time to relieve intense headaches. As time went on he found it necessary to take more frequent doses of the drug. The excess use of this drug in that particular individual manifested itself by pain in the jaw, pain in the face, slurred speech, and a severe and generalized headache. A serum bromide test was made which indicated that he was suffering from bromide poisoning due to the taking of Bromo Seltzer over a period of 20 years.

We think the record as a whole supports the conclusion of the trial court that the state and the association have failed to establish that there is any greater danger to the public when these drugs are sold at self-service counters in supermarkets than when sold by a clerk in a drugstore. The public receives no greater protection in one case than in the other. Moreover, the record supports the trial court's conclusion that there is no causal relationship between injuries sustained by the excessive use of these drugs and the place where they are purchased. The injury may result as well from the excessive use when purchased at a licensed pharmacy. The trial court found that all control over the usage or dosage of the medicines ceased with completion of the purchase and delivery to the customer. We must also agree with the findings of the trial court on the record before us that the sale of these drugs in nonlicensed outlets did not constitute a nuisance nor did such sales affect or endanger the public health to the point where injunctive relief is required.

We pointed out in State v. Red Owl Stores, Inc. *supra,* that no provision is made in c. 151 for injunctive relief in the event of violations of any of its provisions. Punishment for violation is limited to criminal sanctions. We noted that where the sole object of the suit is to enforce criminal penalties courts will not exercise equity jurisdiction and that (253 Minn. 245, 92 N. W. [2d] 110):

"* * * where the acts complained of are violations of the criminal law, the courts of equity will not on that ground alone interfere by injunction to prevent their commission, since they will not exercise their preventive power for the purpose of enforcing criminal laws by re-

straining criminal acts. However, courts of equity will interfere by injunction to restrain acts amounting to a public nuisance if they affect public rights or privileges or endanger public health, regardless of whether such acts are denounced as crimes."

We also said in State v. Red Owl Stores, Inc. *supra,* that the exercise of the court's equity jurisdiction to grant injunctive relief must depend upon the facts in each particular case. We think that the record as a whole here supports the finding of the trial court that the manner of sale of drugs at an unlicensed outlet does not constitute a danger to the public health. The specific damage with reference to the excessive use of Bromo Seltzer followed from purchases of that drug at pharmacies. The specific injury with reference to the excessive use of Ex-Lax could as well have happened to the child had the drug been purchased at a pharmacy and left within the child's reach.

We have pointed out in a number of cases that if upon the facts in the record the trial court could have reasonably found either way we are not at liberty to interfere. Standard Oil Co. v. Bertelsen, 186 Minn. 483, 243 N. W. 701. It is a well-established rule that this court on appeal will consider testimony in the light most favorable to the prevailing party. If the evidence as a whole tends to support the findings, they should not be disturbed. In Boulevard Plaza Corp. v. Campbell, 254 Minn. 123, 137, 94 N. W. (2d) 273, 284, we said:

"* * * The findings of the trial court * * * are entitled to the same weight as the verdict of a jury and will not be reversed on appeal unless they are manifestly and palpably contrary to the evidence, * * *."

An appellate court is controlled by this elementary rule, even though it might have on the basis of the record reached a different conclusion. Weatherston's Assoc. Services v. Minnesota Mutual Life Ins. Co. 257 Minn. 184, 100 N. W. (2d) 819; Boulevard Plaza Corp. v. Campbell, *supra;* Hynan v. First Trust Co. of St. Paul, 258 Minn. 118, 103 N. W. (2d) 209. We are, accordingly, of the view that the findings and order of the court denying injunctive relief must be sustained.

While we agree with the trial court that the showing made on the record before us sustains its conclusion that injunctive relief is not

warranted and that the state must be left to its remedies provided by statute, we cannot agree with its legal conclusion as to the second issue that the products involved in this suit are excepted from the application of the Pharmacy Act. The pertinent provisions of our statute involved in this action are as follows:

"151.15 It shall be unlawful for any person to compound, dispense, vend, or sell at retail, drugs, medicines, chemicals, or poisons in any place other than a pharmacy, except as provided in this chapter.

"No proprietor of a pharmacy shall permit the compounding or dispensing of prescriptions or the vending or selling at retail of drugs, medicines, chemicals, or poisons in his pharmacy except under the personal supervision of a pharmacist or of an assistant pharmacist in the temporary absence of the pharmacist."

"151.01 * * *.

"Subd. 2. The term 'pharmacy' means a drug store or other established place regularly registered by the state board of pharmacy, in which prescriptions, drugs, medicines, chemicals, and poisons are compounded, dispensed, vended, or sold at retail.

"Subd. 3. The term 'pharmacist' means a natural person licensed by the state board of pharmacy to prepare, compound, dispense, and sell drugs, medicines, chemicals, and poisons.

"Subd. 4. The term 'assistant pharmacist' means a natural person licensed as such by the state board of pharmacy prior to January 1, 1930, to prepare, compound, dispense, and sell drugs, medicines, chemicals, and poisons in a pharmacy having a pharmacist in charge.

"Subd. 5. The term 'drug' means all medicinal substances and preparations recognized by the United States pharmacopeia and national formulary, or any revision thereof, and all substances and preparations intended for external and internal use in the cure, mitigation, treatment, or prevention of disease in man or other animal, and all substances and preparations, other than food, intended to affect the structure or any function of the body of man or other animal.

"Subd. 6. The term 'medicine' means any remedial agent that has the property of curing, preventing, treating, or mitigating diseases, or that is used for that purpose."

"151.26 * * * nothing in this chapter shall prevent the sale of common household preparations and other drugs, chemicals, and poisons sold exclusively for use for non-medicinal purposes.

"Nothing in this chapter shall apply to or interfere with the manufacture, wholesaling, vending, or retailing of non-habit forming harmless proprietary medicines when labeled in accordance with the requirements of the state or federal food and drug act; nor to the manufacture, wholesaling, vending, or retailing of flavoring extracts, toilet articles, cosmetics, perfumes, spices, and other commonly used household articles of a chemical nature, for use for non-medicinal purposes."

It is unnecessary to review at length our decisions which have discussed these or other provisions relating to pharmacy.[3] It is sufficient to say that under c. 151 the pharmacy board is given broad power to regulate and control the sale of drugs and medicines. Even though it may be conceded that the 18 products here involved are so compounded that when used according to recommended dosages they are, as the trial court found, harmless and nonhabit forming, we must nevertheless reach the conclusion that they are "substances and preparations * * * intended to affect the structure or any function of the body of man" within the definition of the term "drug" set forth in § 151.01, subd. 5.

■ The defendants earnestly contend, however, that these drugs are excepted from the application of the act by § 151.26 as "non-habit forming harmless proprietary medicines." In considering this claim it is necessary to again inquire what the legislature had in mind by use of the term "proprietary medicines." This exemption was first referred

---

[3]State v. Zotalis, 172 Minn. 132, 214 N. W. 766; State v. Donaldson, 41 Minn. 74, 42 N. W. 781; State v. Hovorka, 100 Minn. 249, 110 N. W. 870, 8 L. R. A. (N. S.) 1272, 10 Ann. Cas. 398; State v. Levine, 173 Minn. 322, 217 N. W. 342; State v. Mayo, 118 Minn. 336, 136 N. W. 849; Tiedje v. Haney, 184 Minn. 569, 239 N. W. 611; Culver v. Nelson, 237 Minn. 65, 54 N. W. (2d) 7; State v. Red Owl Stores, Inc. 253 Minn. 236, 92 N. W. (2d) 103; Minnesota State Pharmaceutical Assn. v. State Board of Pharmacy, 103 Minn. 21, 114 N. W. 245; State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202.

to in the original Pharmacy Act of March 5, 1885, and provided (L. 1885, c. 147, § 12):

"* * * nothing in this act shall in any manner interfere * * * nor prevent shopkeepers whose place of business is more than one mile from a drug or apothecary shop from dealing in and selling the commonly used medicines and poisons, if such medicines and poisons are put up by a registered pharmacist, or from dealing in and selling of patent or proprietary medicines, * * *."

The exemption was carried into L. 1891, c. 104, by a provision that the Pharmacy Act shall not interfere "with the making or vending of proprietary medicines, or with the sale by general retail dealers" of certain other specified drugs and concoctions. By L. 1913, c. 575, the exemption was again preserved. The exemption in its present form first appeared in L. 1937, c. 354, § 27(d). By the latter statute the exception as to the drugs specifically named was deleted. The term "proprietary medicine," however, is preserved.

Numerous authorities in this state have considered the meaning of the term "proprietary" medicine with reference to particular products. In State v. Donaldson, 41 Minn. 74, 42 N. W. 781, the terms "patent" and "proprietary" medicine were used synonymously. This decision was written in 1889 at a time when so-called patent and proprietary medicines were widely sold and used. We have generally followed the rule expressed in Woolworth (N. Z.) Ltd. v. Wynne (1951) N. Z. L. R. 923, that statutory reference to proprietary medicines was intended to include only those medicines which have a proprietor, "not of the label or name under which the medicine is sold, but of the right of mixing or compounding the particular preparation so that it is not the common property of all the world." In State v. F. W. Woolworth Co. 184 Minn. 51, 54, 237 N. W. 817, 818, we said that it means "belonging, or pertaining, to a proprietor; relating to a certain owner or proprietor." In the more recent case of Culver v. Nelson, 237 Minn. 65, 74, 54 N. W. (2d) 7, 12, we observed, "While it is difficult to exactly define proprietary medicines, it is much less difficult to determine those preparations which are not proprietary medicines, * * *." In that case we qualified the definition contained in Tiedje v. Haney,

184 Minn. 569, 239 N. W. 611, by the observation that, while the formula for the preparation of the proprietary medicine need not be secret, nevertheless (237 Minn. 75, 54 N. W. [2d] 13) "there must be some right of ownership in either the method or manner of preparation of * * * the beneficial ingredient of the ultimate product."

■ It would appear from the record that it is now doubtful if anyone can claim exclusive right of ownership to the properties which constitute the beneficial ingredients of the drugs under consideration. There is no longer a secret or mystery as to the properties which impart to them their medicinal value. Ole Gisvold, Ph. D., of the College of Pharmacy of the University of Minnesota, testified that with available scientific methods and instruments a quantitative and qualitative analysis of the 18 drugs under consideration could be made; that he could identify both active and inactive ingredients and determine the amount of each contained in the product. Robert Miller, Ph. D., also of the College of Pharmacy of the University of Minnesota, manufactures drugs and medicines for the University of Minnesota Health Service and Hospitals. The manufacturing equipment located at the University of Minnesota under his supervision has a tablet-making capacity of 2,304,000 tablets per day. He testified that within a 30- or 40-minute period one of his students had manufactured an effervescent aspirin tablet containing the exact ingredients of Alka-Seltzer.[4] The testimony of Dr. Thomas B. Magath, senior member of the staff of the Mayo Clinic, former chairman of the section of clinical pathology, must be respected. The department in which he is employed is primarily concerned with the diagnosis, treatment, and control of disease by laboratory methods. A plant is maintained and operated under his supervision where some drugs used at the clinic are manufactured. Obviously, this plant would not have the elaborate equipment used in the manufacture of mass-produced packaged medicines. This witness testified that if given time and equipment he could produce identical or very similar products to those involved here. The

---

[4]We make allowance for the fact that the trial court was not impressed with parts of Dr. Miller's testimony. We are persuaded on this point by the testimony of Dr. Thomas B. Magath of the Mayo Clinic.

inactive ingredients of these drugs are of no real significance therapeutically. It would not be necessary to follow the same manufacturing methods to reach the same end product, and the reproduction would have all of the therapeutic value of the original. When Dr. Magath started practicing medicine 40 years ago, proprietary drugs and medicines were commonly sold and used. In those days manufacturers were not required to label their products or publish the ingredients of them. Techniques had not been developed by which a compound could be broken down so that its ingredients could be analyzed and determined. The secrecy as to the ownership of the ingredients and formula gave to the product its proprietary character. Dr. Magath explained, however, that today "the chemists, the bacteriologists, the biologists * * * have developed * * * intricate sciences * * * to the extent that we can make competent analyses and competent syntheses of materials, and this is one of the great contributions of science today, and therefore one does not hear so much of proprietary medicines."[5] He further testified that in analyzing the ingredients of drugs—

"* * * We have what are called acceleration tests for stability, for temperature, for roughness, for all of these things. * * * We understand how to do that, and you can make so much more time than you used to be able to make, and therefore, for all practical purposes, some of these compounds would have been clearly by definition a half a century ago be proprietary medicines. Today they are not proprietary because they represent rather easy problems for the well-experienced men who have had the background to do it, * * *."

As an example of what might be called a proprietary medicine today, Dr. Magath suggested that perhaps cortisone might be so considered in view of the complicated chemical steps involved in its construction.[6]

---

[5]These techniques have been developed through the use of "paper chromatography, * * * gas chromatography, * * * spectroscopic material, * * * [including] the invisible light, the ultraviolet and infrared," and other devices which were not available when so-called proprietary medicines were in common use.

[6]Some of the patent and proprietary medicines generally advertised and

The experts who testified in behalf of the defendants, all of whom represented or were consultants for the manufacturers of these products, did not seriously contend that the active ingredients in these compounds could not be analyzed or duplicated. One of their witnesses, who best expressed the manufacturer's claim to proprietary rights, said:

"* * * All 18 of these products have in the process of manufacture certain manufacturing know-how. The mixture and the blending of the various ingredients that belong in each in order to get a most palatable and most efficacious preparation [is a secret belonging to the manufacturer] and the man that would analyze this product could come up with a preparation but it would not be a duplicate of this and it would fall far short of the pharmaceutical elegance that goes into the manufacture of these preparations."

This approach was considered by our court in Culver v. Nelson, 237 Minn. 65, 76, 54 N. W. (2d) 7, 14. In that case we said that where "[a]ny manufacturer having the requisite skill and equipment could prepare any one of the preparations involved or one of a very similar nature * * * it cannot be said that the product is a proprietary medicine." We are accordingly of the opinion that the 18 products before us are not proprietary medicines within the meaning of the exception contained in § 151.26.

■ We are led to the further conclusion that there are today few, if any, proprietary medicines within the meaning of the Pharmacy Act as we have construed it. We are not provided with a history of the origin of the exemption or the reasons why the legislatures had from

---

used around the turn of the century were Dr. Sage's Catarrh Remedy; Dr. M. A. Simmons Liver Medicine; Lydia E. Pinkham's Vegetable Compound; Wine of Cardui; Squills Indian Compound "for coughs, colds, and all affections"; Dr. Morse's Indian Root Pills; Nuxated Iron; Prof. Low's Liniment & Worm Syrup; Dr. Flint's Quaker Bitters; Pe-Ru-Na; Wild Cherry Tonic; Ayer's Sarsaparilla; Dalley's Magical Pain Extractor; Hamlins Wizard Oil; Dr. Williams Pink Pills for Pale People; Hood's Sarsaparilla; Ayer's Ague Cure; Winer's Canadian Vermifuge; Blauds Iron Pills; Wm. Radams Microbe Killer; Dr. King's New Discovery; Wolcott's Instant Pain Annihilator. *One for a Man, Two for a Horse,* by Gerald Carson.

their first enactments allowed unsupervised sales of such drugs and medicines. It may be assumed that the exception was a concession felt to be desirable at a time when society was largely rural, doctors were few and far between, and the legislature sought to make so-called patent and proprietary medicines and other home remedies generally available for purchase in rural and outlying communities. Obviously, the exemption in § 151.26 permitting the unsupervised sale of proprietary medicines, if not obsolete, is now radically restricted in its application. The secrecy which was once the identifying characteristic of the proprietary no longer exists. The reputed medical value of the proprietary which lay in its mystique can no longer stand the test of medical scrutiny. It is apparent that we are dealing here with an antiquated statute, certain provisions of which serve no real purpose under existing social conditions. It not only appears that the proprietary may have lost its identity but that the social conditions which were thought to justify unsupervised sales of it no longer exist. The act should be amended to conform to the realities of our day. Certainly there is no need for an exemption of true proprietaries which may have secret ingredients far more toxic and dangerous than the 18 products under consideration.

The defendants further urge that the interpretation this court has given to the exemption contained in § 151.26[7] is technical and restrictive; that it is unrealistic and fails to recognize that through the years there has been an acceptance by the public of these 18 products as proprietary medicines which have by common usage been brought within the definition and purview of the exception. It is asked that we adopt what is called the "common-usage" interpretation. The approach thus suggested involves a consideration of marketing techniques, trademarks, trade names, advertising, and other factors. It is argued that the proprietary character of the product rests not upon its inherent nature but upon its trade name and the fact that the purchasing public accepts the product by name and reputation without more. Essen-

---

[7]State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202; State v. Zotalis, 172 Minn. 132, 214 N. W. 766; Culver v. Nelson, 237 Minn. 65, 54 N. W. (2d) 7.

tially the common-usage approach seems to be based upon the proposition that the exemption which was once accorded to proprietaries having secret ingredients or formulae has now through the force of advertising been transferred to all packaged trade-marked drugs and medicines. It is argued that as a matter of fact there has been created in the public mind the understanding that the drugs named are true proprietaries which should be considered as such even though the ingredients are known and printed on their labels and containers.

■ Precedent for the adoption of the common-usage interpretation is suggested in authorities from Michigan, California, Illinois, Ohio, Kentucky, and recently Iowa.[8] We have examined the statutes of other states on the subject of exemption of patent and proprietary medicines from the operation of pharmacy acts. We have also examined the authorities in those states which have adopted the so-called "common-usage" interpretation. It appears from those authorities, however, that the adoption of the common-usage approach was permissible because of the particular language contained in the statute. Those courts did not arrive at that result by judicial fiat, as we are asked to do. Although the Supreme Court of Iowa had previously held that aspirin tablets were not proprietary medicines (State ex rel. Missildine v. Jewett Market Co. 209 Iowa 567, 228 N. W. 288), it was permitted, because of a recent amendment to the pharmacy law of that state, to reach a contrary result in State ex rel. Board of Pharmacy Examiners v. McEwen, 250 Iowa 721, 96 N. W. (2d) 189. While the Superior Court of California had some difficulty in People v. Heron, 34 Cal. App. (2d) 755, 757, 90 P. (2d) 154, 155, with a provision exempting "registered, trade-marked or copyrighted proprietary medicines, registered in the United States Patent Office," they felt, nevertheless, that to give the statute effect it should be interpreted to apply to (34 Cal. App. [2d] 758, 90 P. [2d] 155) "those proprietary medicines that are

---

[8]Wrigley's Stores, Inc. v. Board of Pharmacy, 336 Mich. 583, 59 N. W. (2d) 8; People v. Heron, 34 Cal. App. (2d) 755, 90 P. (2d) 154; Smith Hurd, Ill. Ann. Stat. c. 91, § 55.4; State v. Cramer, 95 Ohio App. 493, 121 N. E. (2d) 85; Kentucky Board of Pharmacy v. Cassidy, 115 Ky. 690, 74 S. W. 730; State ex rel. Board of Pharmacy Examiners v. McEwen, 250 Iowa 721, 96 N. W. (2d) 189.

sold in containers bearing the trade mark of the manufacturer of the medicine, if the trade mark is * * * registered in the United States patent office." The Illinois court may reach an interpretation contended for by the defendants because of the particular provisions of its act (Smith Hurd, Ill. Ann. Stat. c. 91, § 55.4), which appears to assimilate the standards provided by "the Federal Food, Drug and Cosmetic Act, regulations of the Department of Health, Education and Welfare, and regulations of the Food and Drug Administration." As we understand Wrigley's Stores, Inc. v. Board of Pharmacy, 336 Mich. 583, 59 N. W. (2d) 8, that court felt free to reach the common-usage approach not only because of the peculiar provisions of its act but because the act did not contain, as does ours, a definition of the word "drug." Likewise, the interpretations of the Ohio and Kentucky courts[9] may be explained by the particular provisions of the statutes of those states.

The defendants further stress the argument found in State v. Donaldson, 41 Minn. 74, 42 N. W. 781, to the effect that the restriction of the sale of packaged drugs and medicines to the pharmacist contributes nothing to the protection of public health and that the consuming public receives no more protection from the purchase of these drugs at a drugstore than elsewhere. But it should be remembered that State v. Donaldson, *supra,* was written long before the passage of the Pure Food and Drug Act of 1906, which was enacted because of the injury sustained by the public as the result of unregulated traffic in medicines having deleterious properties. In later decisions we recognized the advances made in the science of medicine and the broad concomitant power of the legislature to enact laws on that subject in the interest of the public health and welfare. We recognized that there was a reasonable relationship between the sale of drugs and the public health, and that the state could validly exercise its police power by a statute regulating such sales. In State v. Zotalis, 172 Minn. 132, 133, 214 N. W. 766, we said, "[T]he pharmacist knows where to procure a pure and genuine article and his prescribing physicians will require

_____
[9]State v. Cramer, 95 Ohio App. 493, 121 N. E. (2d) 85; Kentucky Board of Pharmacy v. Cassidy, 115 Ky. 690, 74 S. W. 730.

him to furnish a pure drug." And in Culver v. Nelson, 237 Minn. 65, 78, 54 N. W. (2d) 7, 14, we said, "Not only is a pharmacist in a better position to know where to procure a pure and genuine article, but he is equipped by training and education to know and advise prospective purchasers what products contain vitamins they seek in the best combinations."

It is unnecessary for us to review the learned trial court's findings and memorandum with reference to the economic aspects of this issue. It must be conceded that these are not prescription drugs which involve the seller in the physician-patient relationship. Nevertheless, we are dealing here not with folk remedies but with complicated drugs having toxic ingredients, a subject concededly within the province of the legislature to regulate. This was recognized in State v. Zotalis, *supra,* where we said (172 Minn. 133, 214 N. W. 766):

"The legislature thought that the dangers incident to its [aspirin] sale justified regulation and that a restriction of sales to pharmacists or to those under their supervision was effective. It is true that no technical skill is required in making a sale. This does not prove the statute invalid."

Nor can we say that the act has not given the public at least a measure of protection. All of the drugs before us for consideration, which the trial court has found to meet with required standards of purity, are sold by licensed pharmacists. The fact that they are sold by licensed pharmacists should be a warrant as to their quality. Perhaps the reason for failure to establish an injury to the public by sale of these drugs at unlicensed outlets is that such unlicensed sales have been confined to those products which the licensed pharmacist sells. It does not follow from the fact that the pharmacist contributes nothing to the sale of these packaged products that they may as well be sold by anyone anywhere. If all control were suspended over the sale of such drugs and medicines, it may be assumed that the doors would be opened to the widespread sale of new and competitive trade-mark products, including those drugs, medicines, and vitamins which might in an uncontrolled market expose the public to great injury.[10]

---

[10]There are strong reasons relative to the public welfare which make

■ Moreover, it is not within the province of this court to amend or engraft a new provision on a statute merely because a present provision in it may become stale or obsolete.[11] Where with the passage of time and the advance of science and the medical arts a provision in a statute becomes obsolete and may no longer have practical application, as appears here, courts are not free to substitute a new and different provision in place thereof. To do so here would involve the obligation of defining terms and establishing standards as to what particular drugs and medicines may be sold in licensed pharmacies and what drugs and medicines, if any, may be sold elsewhere. The important underlying problems here are legislative in nature.[12] It is for the legislature and not the courts to establish policies and standards with reference to the sale of drugs and medicines.

The order denying a new trial is affirmed. That part of the judgments denying injunctive relief is affirmed. That part of the judgments which provides that the 18 products herein described are proprietary medicines excepted from the provisions of the Minnesota Pharmacy Act is reversed.

The petition for rehearing is denied.

Our attention has been called to the decision of the Court of Appeals of the State of New York in Loblaw, Inc. v. New York State Board of Pharmacy, 11 N. Y. (2d) 102, 226 N.Y.S. (2d) 681, since

it proper that regulations concerning the sale of drugs and medicines should not be confined to poisons, but should be extended so as to embrace harmless household remedies—that is, those that are harmless if properly prepared. The injury to the public health which might ensue if such medicines were carelessly or ignorantly compounded so as to contain deleterious ingredients, or deceptively, so as to be something different from what they are purported to be, is manifest, and the police power logically extends to such medicines therefore no less than to poisons and other lethal medicinal agents. 17A Am. Jur., Drugs and Druggists, § 8.

[11]Farmers & Mechanics Sav. Bank v. Department of Commerce, 258 Minn. 99, 102 N. W. (2d) 827.

[12]State v. Zotalis, 172 Minn. 132, 214 N. W. 766; State v. F. W. Woolworth Co. 184 Minn. 51, 237 N. W. 817, 76 A. L. R. 1202; State v Red Owl Stores, Inc. 253 Minn. 236, 92 N. W. (2d) 103; The Proprietary Assn. v. Board of Pharmacy, 16 N. J. 62, 106 A. (2d) 272.

the foregoing opinion was written. We adhere to our view that it is for the legislature and not for the courts to change the law on this subject.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On June 1, 1962, the following opinion was filed:

PER CURIAM.

Upon appeal from the clerk's taxation of costs and disbursements, the respondents assert that they should not be charged with costs and disbursements because (1) they are in fact the prevailing party; (2) the cost of the transcript, which was prepared on a daily basis during the trial, cannot be allowed in this court because it was not prepared exclusively for use on appeal; (3) more than one-half of the printed record contains immaterial matter and the cost of printing such record should be disallowed; and (4) the amount charged as cost for the printing of the appellant-intervenor's brief was not actually incurred.

■ The issues as determined by the pleadings in this case are discussed in State v. Red Owl Stores, Inc. 253 Minn. 236, 92 N. W. (2d) 103. The state sought to enjoin the defendants and their officers from selling certain drugs and medicines allegedly in violation of Minn. St. 151.15 and 151.25 of the Pharmacy Act. The defendants by their answers sought a determination to the effect that the particular drugs and medicines involved were proprietary and exempt from the provisions of the act. In the court below the defendants prevailed on both issues. By our decision filed February 9, 1962, we affirmed that part of the judgment in the lower court denying injunctive relief. We reversed that part of the lower court's judgment which held that the drugs and medicines involved were proprietary and excepted from the provisions of the Pharmacy Act.

The taxation of costs and disbursements in this court is controlled by § 607.01, which reads in part:

"In all cases the prevailing party shall be allowed his disbursements necessarily paid or incurred."

It is well settled by our authorities that a modification of a judgment entitles the party obtaining the same to costs and disbursements on

appeal. Hildebrandt v. Hagen, 228 Minn. 353, 38 N. W. (2d) 815; 5 Dunnell, Dig. (3 ed.) § 2228. Our most recent statement on this point is set forth in Sanitary Farm Dairies, Inc. v. Wolf, 261 Minn. 166, 177, 112 N. W. (2d) 42, 50, where we said:

"A prevailing party has been defined as one who procures a reversal or modification of the order or judgment from which the appeal is taken."[1]

Since the appellants have secured a reversal on one of the basic issues involved in this action, they are, unless disqualified for some other reason, entitled to costs and disbursements pursuant to § 607.01.

■ We next consider the claim of the respondents that the cost of the transcript cannot be allowed in this court because it was not prepared exclusively for use on appeal. This claim rests upon the unsupported assertion of respondents. Opposed to it is the affidavit of counsel for the appellants in which they affirm:

"That the transcript in the above matter was ordered at the commencement of the trial, so that the same would be prepared and available for immediate appeal to the Supreme Court after the trial below. This was the understanding of all parties, as both sides intended to appeal if the result was adverse to them. Accordingly, the transcript was corrected from day to day by Order of the Court so that it would be immediately available for appeal."

We have held that in the absence of a definite showing to the contrary it will be presumed in taxing costs that a transcript was prepared exclusively for use before the appellate court when such transcript was actually so used and was necessary to the appeal. Northern States Power Co. v. Oslund, 236 Minn. 135, 141, 51 N. W. (2d) 808, 52 N. W. (2d) 717, 718. In that case we said:

"* * * The fact that the transcript may have been prepared prior to, and in anticipation of, the taking of an appeal * * *, or that the

_____

[1]The rule followed in Michigan cases to the effect that where each party wins on an issue they should pay for their own costs and disbursements was considered by this court in Propper v. Chicago, R. I. & P. R. Co. 237 Minn. 386, 54 N. W. (2d) 840, but not followed.

58

transcript may have been used by counsel to refresh their recollection of testimony below in preparation for a proper presentation to this court does nothing to establish that the transcript was prepared for any purpose other than that of necessary use by this court. In the absence of a definite showing to the contrary, it will be presumed, in taxing costs, that a transcript was prepared exclusively for use before the appellate court when such transcript was actually so used and was necessary to review by that court."

■ In considering the objection that more than one-half of the printed record contains immaterial matter and the cost of printing such record should be disallowed, it may again be observed that the claim of the respondents rests upon their bald assertion. Supreme Court Rule VIII(5) (222 Minn. xxxiv) provides:

"Whenever the brief of the prevailing party or the record or supplemental record contains any unnecessary, irrelevant or immaterial matter, he shall not be allowed any disbursements for preparing or printing such unnecessary matter."

The rule goes on, however, to expressly provide that the party entitled to object to taxation of disbursements in such case "shall point out—*specifying the pages or folios*—the particular portions of the record, supplemental record or brief for which he claims the opponent is not entitled to tax disbursements." This the respondents have failed to do. Moreover, we have before us the affidavit of counsel for one of the appellants, which states:

"B. H. Loftsgaarden states that in connection with the appeal of the matter, he travelled to Minneapolis and to the office of Theodor Herman [attorney for some of respondents] and consulted with said Theodor Herman relative to a stipulation for a settled case in the within matter and states that said Theodor Herman required as a condition to said stipulation that every single one of the 6,997 pages typewritten matter of the transcript be printed."

The foregoing statement is uncontradicted in the record. We must accordingly find that this objection is also without merit.

■ The respondents complain that the amount taxed for costs of

printing briefs is excessive. They argue that the sum of $848 was allowed and then assert that only the sum of $115 was expended for appellant intervenor's brief. This objection overlooks the fact that this was a joint appeal taken by the intervenor, Minnesota State Pharmaceutical Association, and the State of Minnesota. In taxing the sum of $848 for the briefs, the clerk of court was apparently satisfied with the representation of the appellants that the sums of $550 and $115 had been expended for the original briefs and the further sums of $162 and $21 for the reply briefs, making a total of $848. We must accordingly find that the clerk taxed the correct amount of costs for this particular item.

Order of the clerk taxing costs and disbursements affirmed.

MR. CHIEF JUSTICE DELL took no part in the consideration or decision of this case.

MR. THOMAS GALLAGHER took no part in the consideration or decision of this case.

MR. JUSTICE OTIS, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.

. MR. JUSTICE ROGOSHESKE, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.