**Danny H. WEBB, Plaintiff-Appellant,**

v.

**ALLSTATE LIFE INSURANCE CO.,
Defendant-Appellee.**

**No. 75–1714.**

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 21, 1976.

Decided June 3, 1976.

James P. Kelley, Oklahoma City, Okl. (El-
liott, Woodard, Rolston & Kelley, Oklahoma
City, Okl., on the brief), for plaintiff-appel-
lant.

Kenneth N. McKinney, Oklahoma City,
Okl. (McKinney, Stringer & Webster, Okla-
homa City, Okl., on the brief), for defend-
ant-appellee.

Before LEWIS, Chief Judge, and SETH
and HOLLOWAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

The plaintiff Webb brought this action
against the defendant insurance company,
Allstate, to recover an accidental death ben-
efit provided in a life insurance policy cov-
ering his wife.[1] The suit was removed to
the District Court on diversity grounds.
Jury trial was demanded. The company
was granted a summary judgment, and the
plaintiff appeals.

Mrs. Webb died on January 30, 1974, in
St. Anthony Hospital in Oklahoma City.
On the basis of stipulated exhibits including
a death certificate, an amendment thereto,
and similar reports and hospital records, the
company moved for summary judgment, re-
lying on statements therein that the imme-
diate cause of death was pneumonia which
was due to "Drug Overdose" (R. 80, 81).
Among other things the records show an
"accidental drug overdose (aspirin)" and
that Mrs. Webb was having headaches and
anxiety and was taking aspirin (R. 83). The
company's position is that the death was
excluded from the accidental death benefit
by the exclusion for death from "overdose
of drugs", as appearing in the following
language of the policy (R. 64):

> Risks Not Assumed—The Company does
> not assume the risk of death of an in-
> sured person caused or contributed to,
> directly or indirectly, by disease, by bodi-
> ly or mental infirmity, or by treatment,
> or operation for disease or bodily or men-
> tal infirmity, nor resulting from any of
> the following causes: . . . ; sensitivi-
> ty to or overdose of drugs or the taking
> of any kind of poison or the inhaling of
> any kind of gas, voluntary or involun-
> tary; . . .

The plaintiff submitted opposing affida-
vits. His position essentially is that the
death resulted from the taking of several

---

1. The accidental death benefit was provided in
the policy for two-fifths of the face amount of
the policy and in an additional accidental bene-
fit rider to the policy for an additional two-
fifths of the face amount of the policy (R.
64–67).

normal doses of aspirin, with a build-up of salicylate-bromide and that the death was not one which would come within the "overdose of drugs" exception, according to ordinary understanding of the phrase.

After consideration of the motion, the stipulated exhibits, the response and the opposing affidavits, the trial court granted summary judgment. The order reviewed thoroughly the contract provisions and the papers submitted by the parties. The order stated that "[t]he death was accidental and it did not result from a sensitivity to drugs." (R. 120). It concluded that the contention that aspirin was not considered a drug according to plain and ordinary meaning was without merit; that the term "overdose" as ordinarily understood included the taking of multiple doses of aspirin over a period of days, according to plain, ordinary and popular meaning; that the term "overdose of drugs" was not ambiguous and included aspirin as a drug and multiple doses over a period of time. Summary judgment was entered and this appeal followed.

Among other things, plaintiff argues that the trial court erred: (1) in concluding that the phrase "overdose of drugs" is not ambiguous; (2) in determining that there were no genuine issues as to material facts; and (3) in not giving plaintiff the benefit of all reasonable inferences that could possibly be drawn from the evidence. The issues require analysis of the summary judgment papers in our record.

As stated, the death certificate indicated the immediate cause of death was pneumonia, "due to or as a consequence of Drug Overdose" (R. 80–81). The hospital records show that Mrs. Webb had been admitted first to Bethany General Hospital on January 26, 1974, with complaint of hyperventilation and confusion. According to her husband she had been taking aspirin and nervine in large amounts (R. 68). The admitting laboratory report included a statement that the blood salicylate level was 70% (R. 68). On January 27 she developed acute pulmonary edema (R. 68). Dr. Matter was consulted and felt she should be transferred to St. Anthony Hospital for dialysis. She was admitted at St. Anthony on January 28 (R. 68).

The hospital records there reflect that she was responsive to painful stimuli but was not conscious (R. 68–69). The impression noted on January 28 was: (1) salicylate-bromide overdose; (2) bilateral lobar pneumonia; (3) acute hypoxia. She was deeply comatose early on the morning of January 29. Later that morning no identifiable brain activity was noted on an E.E.G. (R. 73). On January 30 a further E.E.G. was made and no evidence of cortical activity could be seen with maximum amplification. The findings were those of a flat record in keeping with cerebral death (R. 78). A report of investigation by a medical examiner following an inquest states that her death occurred at 2:45 p. m. on January 30.

As stated, in opposing the company's theory of death from "overdose of drugs" and a summary judgment on this basis, the plaintiff submitted the affidavits of two attending physicians and the medical examiner who conducted an inquest. The affidavit of one attending physician, Dr. Bumpus, stated in part (R. 103):

> That I was one of the attending physicians of Sharon Kay Webb, at the time of her death.
>
> *Sharon Webb did not die as a result of the taking of one large dose of aspirin. Rather, she died as a result of the accidental buildup in her system of aspirin. Such buildup occurred over a period of days and was the result of the taking of several normal doses of aspirin.*
>
> In my experience as a physician with the general public, such experience being over a period of 15 years, I state that Sharon Kay Webb, did not die as a result of "overdose of drugs" as is commonly understood by the average man. *I further state that the average man does not consider aspirin (medical term: salicylate) to be a drug, as the term "drug" is commonly understood.* (Emphasis added).

The affidavit of the second attending physician, Dr. Matter, stated similar views

(R. 105). The medical examiner also said that Mrs. Webb "died as a result of the accidental buildup in her system of aspirin." He further stated that by use of the term "Drug Overdose" in the amendment to the death certificate he did not mean that Mrs. Webb died as a result of ingesting one large dose of aspirin at one time (R. 107).

Terms of an insurance policy must be considered not in a technical but in a popular sense, and must be construed according to their plain, ordinary and accepted sense in the common speech of men, unless it affirmatively appears from the policy that a different meaning was intended. *Reliance Ins. Co. v. Jones,* 296 F.2d 71, 73 (10th Cir.). We note a popular definition of "overdose" as "too great a dose." Webster's Seventh New Collegiate Dictionary (1967) p. 601. A "dose" is there first defined as "1 a: the measured quantity of a therapeutic agent to be taken at one time" Id. at 249.[2] Medical dictionaries contains similar definitions referring first to a quantity of a drug or other remedy to be taken at one time.[3] We note also a third popular definition of "drug" as "3: a narcotic substance or preparation," Webster's Seventh New Collegiate Dictionary (1967) p. 255,[4] and others as a habit-forming substance.[5]

In the circumstances of this controversy we cannot agree that aspirin may be declared a drug as matter of law,[6] and we cannot rule out the drawing of differing inferences as to whether Mrs. Webb's death resulted from "overdose of drugs." We intimate no view as to the merits of the case. It might be inferred that the death occurred from "overdose of drugs," within the meaning of the exclusion. Nevertheless, in light of all the circumstances about the buildup of aspirin, and the differing views that may be taken on the basis of the popular understanding of the phrase "overdose of drugs," it might also be inferred that the death was not within the exclusion.

Where different ultimate inferences may properly be drawn, the case is not one for summary judgment. *United States v. Diebold,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; *American Fidelity & Casualty Co. v. London & Edinburgh Ins. Co.,* 354 F.2d 214, 216 (4th Cir.). The court must examine the summary judgment pa-

---

**2.** The full definition reads as follows:

   1 a: the measured quantity of a therapeutic agent to be taken at one time b: the quantity of radiation administered or absorbed 2: a portion of a substance added during a process 3: a portion of an experience to which one is exposed

**3.** Stedman's Medical Dictionary (22d Ed. 1972, p. 375) defines dose as:

   The quantity of a drug or other remedy to be taken or applied all at one time or in fractional amounts within a given period.

Dorland's Illustrated Medical Dictionary (25th Ed. 1974, p. 472), defines dose as:

   dose (dose) [Gr. *dosis* a giving] a quantity to be administered at one time, such as a specified amount of medication, or a given quantity of roentgen ray or other radiation.

**4.** The full definition given is as follows:

   1 a *obs:* a substance used in dyeing or chemical operations b: a substance used as a medicine or in making medicines 2: something little sought after a ⁀on the market 3: *a narcotic substance or preparation* (Emphasis added).

**5.** "Drug" is also defined, *inter alia,* as:

   ". . . 2. a habit-forming medicinal substance; narcotic." The Random House Dictionary of the English Language (Unabridged, 1967) p. 438.

   ". . . 2. a narcotic, especially one that is addictive." The American Heritage Dictionary of the English Language (1975) p. 400.

   ". . . 3. a substance that causes addiction or habituation." Merriam-Webster New Collegiate Dictionary (1975) p. 350.

   ". . . 2. a narcotic." Dorland's Illustrated Medical Dictionary (25th Ed. 1974) p. 476.

**6.** The trial court relied on cases from several States which state that aspirin is a drug. See, e. g., *State v. Red Owl Stores, Inc.,* 262 Minn. 31, 115 N.W.2d 643, 647 (1962) (R. 122). However, none of these cases concern the question whether aspirin is understood to be a drug according to the plain and ordinary meaning of the word as used here. Rather they involve state regulation of the sale of drugs and the question whether preparations including aspirin could be sold in certain types of stores or dispensed by certain professionals. See *State v. Red Owl Stores, Inc., supra.* We do not feel that such cases decide, as a matter of law, our question concerning the ordinary meaning of the exclusion and permissible inferences in these circumstances.

**340**

pers in the light most favorable to the party opposing the motion. *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir.). All the ambiguities and disagreements must be resolved in favor of the party against whom summary judgment is sought. *Heyman v. Commerce And Industry Insurance Company*, 524 F.2d 1317, 1321 (2d Cir.). And in particular, exceptions from coverage are to be strictly construed against the insurer when their application is doubtful. *Equitable Fire and Marine Insurance Company v. Allied Steel Construction Co.*, 421 F.2d 512, 513 (10th Cir.).

While we express no view on the merits, we feel this is not a case where the moving party has demonstrated his entitlement to judgment beyond a reasonable doubt. See *Mustang Fuel Corp. v. Youngstown Sheet & Tube Co.*, 516 F.2d 33, 36 (10th Cir.); *Hughes v. American Jawa, Ltd.*, 529 F.2d 21, 25 (8th Cir.). We feel that inferences favorable to plaintiff could be deduced from the facts and circumstances and thus the summary disposition was inappropriate. See *Mustang Fuel Corp. v. Youngstown Sheet & Tube, supra* at 36. Accordingly, we conclude that the summary judgment should be vacated and the case remanded for further proceedings.